Petition of **HARBOR TOWING CORPORATION**, Owner of the **TUG VIRGINIA**, for Exoneration from or Limitation of Liability.

**BETHLEHEM STEEL CORPORATION,**
a body corporate

**v.**

**ISTHMIAN LINES, INCORPORATED,** a body corporate and **SS STEEL DESIGNER**, her engines, tackle, etc. (two cases).

**ISTHMIAN LINES, INCORPORATED,**
as owner of the Steamship Steel Designer, Cross-Libellant,

**v.**

**BARGE BETHCOAL NO. 1** and Bethlehem Steel Corporation, Cross-Respondents.

**ISTHMIAN LINES, INCORPORATED,**
as owner of the Steamship Steel Designer, Cross-Libellant,

**v.**

**BARGE BETHCOAL COMPANY, NO. 1,**
and Bethlehem Steel Corporation, Cross-Respondents.

Nos. 4822, 4921.

United States District Court,
D. Maryland.

March 20, 1970.

William A. Grimes, Ober, Williams & Grimes, Baltimore, Md., for Harbor Towing Corp.

David R. Owen, Semmes, Bowen & Semmes, and Peter Parker, Baltimore, Md., for Bethlehem Steel Corp.

John H. Skeen, Jr., William A. Skeen and Skeen, Wilson & Gilbert, Baltimore, Md., Richard H. Brown, Jr., and A. J. Blank, Jr., Kirlin, Campbell & Keating, New York City, for Isthmian Lines, Inc.

Theodore R. Dankmeyer and Donald A. Krach, Niles, Barton, Gans & Markell, Baltimore, Md., and Louis P. Sheinbaum and Bigham, Englar, Jones & Houston, New York City, for Aetna Ins. Co. and another.

WATKINS, District Judge.

At about 6:00 p. m. on December 31, 1964, on a clear night with good visibility, the SS STEEL DESIGNER, owned by Isthmian Lines, Incorporated (Isthmian) collided with BARGE BETHCOAL, NO. 1 owned by Bethlehem Steel Company (Bethlehem) in Chesapeake Bay near Buoy 12C in the Craighill Channel Approach to Baltimore Harbor. BETHCOAL NO. 1, was in tow by the Tug VIRGINIA owned by Harbor Towing Corporation (Harbor) en route from Norfolk to Sparrows Point, loaded with some 5,300 tons of coal. The STEEL DESIGNER, under the management of a Chesapeake Bay Pilot, struck the BETHCOAL NO. 1 on her starboard side about amidship, holing her so that she subsequently sank outside of the channel near Belvedere Shoals. As a result the BETHCOAL NO. 1, although subsequently raised and repaired, was a total loss, as was her cargo of coal. The STEEL DESIGNER sustained substantial bow and bottom damage, and incurred general average expense.

About five months later, Harbor filed a petition for exoneration from or limitation of liability to the value of the VIRGINIA, not exceeding $30,000.00, plus the freight pending of $2,000.00. An ad interim stipulation for value of the tug and her pending freight in the amount of $32,000.00, with interest, was filed.

Isthmian, as owner of the STEEL DESIGNER and as bailee of the cargo laden

thereon, filed a claim against Harbor both in personam and in rem in the estimated sum of $125,000.00. The claim recited a claim by Bethlehem against Isthmian for damages originally estimated at $475,000.00, subsequently increased to $619,000.00. Isthmian claimed against Harbor for Isthmian's own damages, and for all amounts that might be allowed against Isthmian and the STEEL DESIGNER resulting from such collision.

Bethlehem answered Harbor's petition for exoneration from or limitation of liability, admitting fault on the part of STEEL DESIGNER, but also alleging fault on the part of the VIRGINIA and contesting limitation of liability. It also filed claim against Harbor in the amount of $619,500.00, plus any "contingent damages."

Aetna Insurance Company (Aetna) and twenty-two others, as parties in interest, or insurers, of general cargo laden on the STEEL DESIGNER filed claim against the VIRGINIA in the amount of $25,000.00, and asked priority over the claims on behalf of the owners of the STEEL DESIGNER and BETHCOAL NO. 1.

Aetna also filed an answer alleging fault on the part of the VIRGINIA and BETHCOAL NO. 1, and asking for a denial of limitation, and for priority over claims of Isthmian and Bethlehem.

In November 1965, Bethlehem [1] filed a libel and complaint against Isthmian in personam and against the STEEL DESIGNER in rem, for repairs, demurrage, surveyor's fees, loss of cargo and "other losses and expenses" in the amount of $619,500.00.

Isthmian filed a cross-libel against BETHCOAL NO. 1 in rem and Bethlehem in personam. Damages in the amount of $125,000.00 were claimed for "the cost of repairs, general average loss and expenditure, loss of use of the vessel during repairs, damage to cargo, survey fees and other incidental expenses . . ."

Thereafter the two cases were consolidated.

It was agreed that the questions of liability, and limitation thereof, should be decided before a trial (if necessary) on the extent of damages, was held.

*Agreed Facts and Law.*

As of the time in question:

*Agreed Facts.*

(1) The vessels involved were:

|  |  | STEEL DESIGNER | BETHCOAL NO. 1 | VIRGINIA |
|---|---|---|---|---|
| Gross tons | | 7,927 | 2,396 | 130 |
| Net tons | | 4,674 | 2,396 | 65 |
| Length | | 468.5' | 271.6' | 90' |
| Breadth | | 69.6' | 52.0' | 19' |
| *Depth* | | 29.5' | 18.6' | 10' |
| Draft | foreward | 17'5" | 15'–16' | 11'6" |
| | aft | 18'11" | | |
| Propulsion | | Steam Turbo Reduction Single Screw Right Hand | None | Direct-Reversing Diesel |

---

1. The action was by Bethlehem Steel Corporation, successor by merger to Bethlehem Steel Company.

(2) Prior to January 1, 1965 the Tug VIRGINIA had made twenty-four voyages from Norfolk, Virginia to Sparrows Point, Maryland, towing the Barge BETHCOAL NO. 1 loaded with coal; eighty-eight voyages towing the Barge BETHCOAL NO. 2 loaded with coal; and ninety-six voyages towing the Barge BETHCOAL NO. 3 loaded with coal.· The three barges are almost identical as to the data set forth in (1) above.

(3) The night of December 1, 1964 was dark but clear, with a visibility of eight to ten miles. There was a Northwest wind of ten to twelve miles an hour.

(4) The Master of the STEEL DESIGNER was Gustav E. Sundberg. With him in the wheel house were Tjerk B. Susemihl, Chesapeake Bay Pilot [2], Albert Norman Gott, Second Mate and Watch Officer, and Antonius Kotsis, an able-bodied seaman, the helmsman.

John Charles Alberti, an ordinary seaman, was the lookout stationed at the bow of the STEEL DESIGNER; and Edmund James Len was a·fireman.[3]

5. Leland G. Larrimore was the Master in charge of the Tug VIRGINIA and its tow, and was in the wheelhouse. ·Jacob A. Bryan was Chief Engineer of the tug, and was in the engine room. Philip Gibson, deckhand, was in the wheel house a few minutes before the collision, but at the time of the collision was attending to the towing hawser. The first two testified. Gibson's Coast Guard examination was offered into evidence.

6. The BETHCOAL NO. 1 was being towed by a 230 foot hawser, attached to it by a bridle.

7. The collision occurred at approximately [4] 6:00 p. m. or 1800.

8. The collision occurred in Craighill Channel above Buoy 12C and well below Buoy 14C.

9. The towage was pursuant to a contract between Bethlehem and Harbor, the pertinent parts reading:

\* \* \* \* \* \*

"Harbor Towing Corporation will tow such barges, one barge to a tow, between the above mentioned locations, complying at all times with applicable Federal or State laws and regulations. Each barge will be towed light from Sparrows Point to off designated Coal Pier at Hampton Roads, Virginia at which point tugs supplied by the respective railroad coal loading pier will dock the barge. Upon completion of loading, tugs supplied by the respective railroad coal loading pier will undock the barge and turn over to Harbor Towing Corporation tug. Tug will remain in sufficient proximity to Coal Pier while barge is being loaded with coal and, after loading is completed, will return the loaded barge to Sparrows Point. At Sparrows Point, Maryland, Harbor Towing Corporation tug will remain in constant contact and where repairs, fuel, stores, or supplies are required, permission to perform said functions is to be obtained from Bethlehem Steel Company, Marine Division, Sparrows Point, Maryland with an estimate of time required and actual time taken for said functions. The barges may be used on an intermittent basis depending upon coal requirements, availability of coal at Hampton Roads and ability of Bethlehem Steel Company to receive coal at its Sparrows Point Plant.

2. He had piloted 6,239 vessels, some 6,000 through the Craighill Channels.

3. Of these six, only the pilot testified in court. Depositions were taken of the Master, Alberti, and Len; and the testimony of Gott and Kotsis at the Coast Guard investigation was offered in evidence.

4. The entry in the STEEL DESIGNER'S deck log was not made until after midnight. The time of the collision was not, and apparently could not be, ascertained from that ship's course recorder, which incidentally was one hour and five to seven minutes fast.

Ship's time was primarily used in the evidence, and was used in making the charts offered into evidence.

It is further agreed that all towing of the Bethcoal No. 1, Bethcoal No. 2 and Bethcoal No. 3 for the purpose of transporting coal from Hampton Roads, Virginia to Sparrows Point, Maryland will be performed by Harbor Towing Corporation.

\* \* \* \* \* \*

"Harbor Towing Corporation will maintain all lights aboard the barges. Batteries, lamps, and other equipment necessary to keep the lights working will be procured by Harbor Towing Corporation for the account of Bethlehem Steel Company, Marine Division. Invoices submitted by Harbor Towing Corporation for cost of such supplies must be sustantiated with receipted invoices from the vendors.

\* \* \* \* \* \*

"It is understood that there will be no riding crew aboard the barges.

"The tug or tugs assigned to do the towing namely, tug SOPHIA or similar substitutes; dimensions 105′x20.5′ x10.2′ with 900 horsepower, are to be covered with the usual form of Marine Hull insurance with Collision Liability (including standard Towers Liability clauses) in an amount equal to at least the value of each towing vessel."

10. Craighill Channel has a width of 600 feet.

11. Full cruising speed of the STEEL DESIGNER was thirteen knots per hour, or approximately 1300 feet per minute. There was no testimony as to the effect of the wind on the speed of that vessel.

12. The tug and its tow were averaging slightly better than four knots an hour, or 400 feet per minute.

### Agreed Law.

1. Craighill Channel is a narrow channel within the meaning of Article 25 of the Inland Rules, 33 U.S.C. section 210 which provides:

"In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or midchannel which lies on the starboard side of such vessel."

2. Rule 1 of Article 18 of the Inland Rules provides:

"Rule I. When steam vessels are approaching each other head and head, that is, end on, or nearly so, it shall be the duty of each to pass on the port side of the other; and either vessel shall give, as a signal of her intention, one short and distinct blast of her whistle, which the other vessel shall answer promptly by a similar blast of her whistle, and thereupon such vessels shall pass on the port side of each other. But if the course of such vessels are so far on the starboard of each other as not to be considered as meeting head and head, either vessel shall immediately give two short and distinct blasts of her whistle, which the other vessel shall answer promptly by two similar blasts of her whistle, and they shall pass on the starboard side of each other.

"The foregoing only applies to cases where vessels are meeting end on or nearly end on, in such manner as to involve risk of collision; in other words, to cases in which, \* \* \* by night to cases in which each vessel is in such a position as to see *both* the sidelights of the other.

"It does not apply \* \* \* by night to cases where the red light of one vessel is opposed to the red light of the other, or where the green light of one vessel is opposed to the green light of the other, or where a red light without a green light or a green light without a red light, is seen ahead, or where both green and red lights are seen anywhere but ahead."

3. Article 3 of the Inland Rules, 33 U.S.C. section 173 provides, with respect to lights on towing vessels that:

"A steam vessel when towing another vessel or vessels alongside shall, in addition to her side lights, carry two bright white lights in a vertical line, one over the other, not less than three feet apart, and when towing one or

more vessels *astern*, regardless of the length of the tow, shall carry an additional bright white light three feet above or below such lights. * * * "

4. While the Inland Rules contain no provisions with respect to lights on barges or scows, Coast Guard Regulations (33 C.F.R. section 80–16) provide:

"(a) On the harbors, rivers, and other inland waters of the United States * * * canal boats, scows, and other vessels of nondescript type not otherwise provided for, when being towed by steam vessels, shall carry lights as set forth in this section.

"(b) Barges and canal boats towing astern of steam vessels, when towing singly, or what is known as tandem towing, shall each carry a green light on the starboard side and a red light on the port side, and a white light on the stern, except that the last vessel of such tow shall carry two lights on her stern, athwartship, horizontal to each other, not less than 5 feet apart, and not less than 4 feet above the deck house, and so placed as to show all around the horizon. A tow of one such vessel shall be lighted as the last vessel of a tow.

* * * * * *

"(g) The colored side lights referred to in this section shall be fitted with inboard screens so as to prevent them from being seen across the bow, and of such a character as to be visible on a dark night, with a clear atmosphere, at a distance of at least 2 miles, and so constructed as to show a uniform and unbroken light over an arc of the horizon of 10 points of the compass, and so fixed as to throw the light from right ahead to 2 abaft the beam on either side. The minimum size of glass globes shall not be less than 6 inches in diameter and 5 inches high in the clear."

5. The Prudent Practice Rule 33 U.S.C. section 221 provides in pertinent part that:

"Nothing in these rules shall exonerate any vessel, or the owner, or master or crew thereof, from the consequences * * * of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

### Narrative Statement.

At about [5] 1746, when the STEEL DESIGNER was in Craighill Channel Upper Range at about Seven Foot Knoll, the pilot and Captain observed a green light, and three white lights, of a vessel which turned out to be the tug VIRGINIA, at approximately Buoy 10 in Craighill Channel. They both correctly construed the light to indicate a tug towing a barge astern. The pilot testified that he did not recall seeing the tug's range lights at any time. The Captain in his deposition said that he did not recall seeing the tug's range lights. Gott, the second mate and watch officer, testified before the Coast Guard that he "may or may not have seen white on the range" but he could not be sure of it; the only thing he remembered was "looking up and seeing the green light." Alberti, the bow lookout, saw the mast white lights, three or four, in an "L" shape and a green light (Deposition, page 10). He did not know what three or four white lights meant.[6]

No one on the STEEL DESIGNER acknowledges having seen any barge lights before the collision.

According to Larrimore, the tug's red and green running lights, its white range lights, and white lights indicating a tow astern, were turned on at dusk; and the barge's red and green foreward lights, and two horizontal white stern lights, were on continuously

---

5. The following times are approximate, but were used without serious question throughout the trial.

6. There is no testimony by any one on the STEEL DESIGNER of any examination after the collision to see if the tug's range lights were in fact lighted.

for the trip to Norfolk, while there, and on the return trip.

According to the pilot and captain of the STEEL DESIGNER they assumed that the tug and tow were crossing Craighill Channel from east to west, although the tug and tow, by their judgment, were at all times in the channel.

At about 1753–1754, when the STEEL DESIGNER was slightly more than half way down Craighill Angle, and the tug was about half way between buoys ten and twelve, according to the pilot and captain [7] the STEEL DESIGNER gave a two blast whistle for a starboard to starboard passing. No reply was received, either because the blasts were not heard, or were not given. The tug captain denied hearing the alleged first two blast whistles.

At about 1756, just before the STEEL DESIGNER was required to make a sharp turn to starboard to leave Craighill Angle and enter Craighill Channel, she gave a two-blast starboard passing whistle, which was accepted by a two-blast reply from the VIRGINIA. Very shortly thereafter, the tug turned her search light on the BETHCOAL NO. 1, which was then for the first time seen by the STEEL DESIGNER. The tug and her tow were at that time, as they had been all the way up Craighill Channel, close to the East bank of the channel. The STEEL DESIGNER, which up to that time had been proceeding at full cruising speed, then stopped her engines, ordered hard left wheel,[8] and in one minute had reduced her speed to 1000 feet a minute, and at the time of the collision, about one minute later, was travelling at approximately 850 feet a minute. The STEEL DESIGNER

safely passed the tug, but collided with the barge slightly aft of midship, at an angle placed by the tug at 25°; by the captain of the STEEL DESIGNER at 40°, and by the pilot at 30°.

According to the pilot, the collision took place at the East side of the channel, and his ship "touched the bank and barge at the same time simultaneously.[9] Although the tug captain and the pilot placed the point of collision somewhat differently, about 900 feet apart, there were twenty feet of water for several hundred feet to the East of the channel at both locations, so that the grounding and collision could not have been "simultaneous." There is a 16 foot knoll immediately adjacent the East side of the channel about 500 feet north of where the pilot places the collision, and it is probable that this was struck by the STEEL DESIGNER.

After the collision the bow of STEEL DESIGNER was so firmly embedded in the side of the barge that the STEEL DESIGNER could not free itself unaided. The barge was pushed by the STEEL DESIGNER to the vicinity of Belvedere Shoal where, with the aid of the VIRGINIA, it was freed and sank, part however remaining above water. Its position was marked by repositioning its white rear lights.

The tug captain admits that he saw the green light of the STEEL DESIGNER when that vessel was in the vicinity of Seven Foot Knoll and the VIRGINIA was near Buoy 10. He contends that the heading of the tug, and the course of the tug and tow, was practically due north during the entire time in question, and denies that the Northwest wind had any effect upon the towing operation, or

---

7. The entry in the ship's log, and the testimony of the lookout, bearing upon the first two-blast whistle, will be considered later.

8. Kotsis, the helmsman, testified before the Coast Guard that about this time he was having trouble with the compass. He also testified: "I get order from

the starboard wing hard left, I put left because I already hard left."

9. The testimony in court was not transcribed (except portions relating to the testing of lights similar to those on the barge). The quotation is from the Court's longhand notes.

caused him to head the tug towards the Northwest.[10]

The tug captain heard only one two-blast whistle. Before this, he had been watching the course of the STEEL DESIGNER, had concluded that she was moving too fast to make the right turn from Craighill Angle into Craighill Channel, and expected her to run aground on the Eastern side of the channel. When he heard the two-blast whistle this confirmed his belief that the STEEL DESIGNER was unable to make a port to port passing, and his acceptance of the starboard to starboard invitation was because it "looked like the only way we could go by with safety"; he assumed the STEEL DESIGNER knew what it was doing. He did not turn to port, as this would have sheered the barge to starboard,[11] directly in front of the STEEL DESIGNER; and to change the course of the barge and get the tug in front and have the barge follow would have taken four to five minutes.

### Discussion.

1. Fault on the part of the STEEL DESIGNER.

At oral argument, counsel for Isthmian frankly admitted fault on the part of the STEEL DESIGNER, without, however, taking a position as to whether it was major or minor.

■ To sight a tug towing something, but making no effort by binoculars or radio phone to discover what or where the tow was; to assume blithely that the tug was towing a light barge and was crossing the channel although for the entire fourteen minutes from sighting to collision the tug, at 400 feet a minute, had not crossed a 600 foot channel; to continue at full speed after no reply was received to the first two-blast signal (if it was given); to call either once or twice for a starboard to starboard passing, without knowing or endeavoring to determine the location of the tug and tow in the channel, and to make no effort so to do, by telephone inquiry or the sounding of danger signals, or by plotting the relative movement of the tug—a matter that the expert navigator or pilot faces many times a day and for which "simple plotting sheets are available"[12]; clearly establishes that "navigation," if it can be called such, of the STEEL DESIGNER was grossly at fault.

Further, from the disputed testimony the Court finds as a fact that only one two-blast signal was given by the STEEL DESIGNER at a time when it was about to enter Craighill Channel, and not more than four minutes before the collision. This conclusion is reached on the following facts:

(a) The alleged first blast was not heard by the VIRGINIA. Had all in a position to hear, on the STEEL DESIGNER, testified that it gave two sets of signals, this would clearly outweigh the purely negative testimony of the VIRGINIA; but

(b) The deck log of the STEEL DESIGNER contains the following entry:

"1746   7 ft. knoll light 1756 second two blasts [undecipherable] tow boat 1758 stop 1800 vessel collided with tow."

No entry is made as to a first two-blast signal. This is especially significant in view of the entries:

"1725 Blow for dredge.   1731 Pass dredge."

(c) The above entry of "1756 second two blasts" was made by Gott, second mate and watch officer. When examined before the Coast Guard he testified that

---

10. Expert testimony was offered that the tug would have to head, from time to time, toward the Northwest to counteract the effect of the wind on the tow. Because of the small amount of superstructure of the barge above water, this is questionable. In any event, the STEEL DESIGNER'S expert testified that this would probably not be for more than five minutes, and certainly not for fourteen minutes (1746–1800).

11. Just as the STEEL DESIGNER did not reverse its propeller, as this would have caused the bow to go to starboard.

12. Per Isthmian's expert, Suarez.

this entry was made after midnight of December 31, 1964; that he couldn't say whether he heard the first blast; did not know whether it was one or two, and that:

"The reason I felt it was the second one because I overheard the captain and pilot speak about a two-blast."

\* \* \* \* \* \*

"Like I spoke of once before, I did hear them [the captain and pilot] speak of the second two whistle blast \* \* \*"

(d) Kotsis, the helmsman, was not interrogated as to any whistle signals.

(e) In his deposition Alberti, the bow lookout, testified (Deposition, pages 6–7) that after returning from supper he "seen a mass of white lights and a green light" on the starboard side, which he reported by ringing one bell.

"After I reported the light I rang the bell, and in about one or two minutes, somebody [on his ship] blew the whistle, two blasts, and there was a return reply from the tug."

This is consistent with, and only with, one set of two blasts and is the testimony of the member of the crew of the STEEL DESIGNER in the best position to hear.

(f) In its Accident Report to the Coast Guard, submitted "Jan. 4, 1964" [obviously an early-year error for 1965], under the heading

"30—DESCRIPTION OF CASUAL-TY (Events and circumstances leading to casualty and present when it occurred \* \* \*)" the answer is simply:

"Agreed starboard to starboard passing with tug 'Virginia' and its tow.

"Tug 'Virginia' failed to carry out starboard to starboard passing"

The STEEL DESIGNER was clearly at fault, and the fault was gross.

2. Fault on the part of the VIRGINIA.

None of the parties has urged fault on the part of the VIRGINIA with respect to its range lights, or the absence thereof. Charges of fault are made, however, in a number of other respects:

(a) The absence of a look out on the VIRGINIA.

■■ The VIRGINIA had no proper lookout at or before the collision. The officer in charge of navigation is not a competent lookout; and the deckhand Gibson, in the pilot house, or at the stern tending the hawser, was not acting as a competent lookout. City of Philadelphia v. Gavagnin, 3 Cir. 1894, 62 F. 617; The Ariadne, 1871, 80 U.S. (13 Wall.) 475, 478, 20 L.Ed. 542; Chamberlain v. Ward, 1858, 62 U.S. (21 How.) 548, 570, 16 L. Ed. 211; The Ottawa, 1865, 70 U.S. (3 Wall.) 268, 273, 18 L.Ed. 165. See also Harbor Towing Corp. v. Tug Reliance, E. D.Va.1963, 211 F.Supp. 896, 902.

■ Failure to have a proper lookout is a fault akin to a statutory breach, to which the rule of The Pennsylvania, 1873, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 is applicable. Here, however:

(i) The case was not one in which the absence of a lookout resulted in the failure to detect the presence of a vessel, or its bearing and course. The tug captain was aware of the STEEL DESIGNER and its course from 1746. Nothing a lookout could have told him would have assisted, or given him greater knowledge.

(ii) The Court has found that only one two-blast signal was given by the STEEL DESIGNER. That signal was heard by the tug captain himself, and in this respect the presence or absence of a lookout was immaterial.

■ Even if, contrary to the finding by the Court, a first two-blast signal was given, it was not answered. Under these circumstances the STEEL DESIGNER proceeding contrary to the rules of the road without assent, took the chance of its signals not having been heard. When its (alleged) first proposal for a starboard to starboard passing received no response, it was the duty of the STEEL DESIGNER to stop and if necessary reverse until the course of the VIRGINIA was ascertained with certainty. The Gerry, D.Md.1908, 161 F. 413, 418–419.

(b) Barge lights.[13]

The testimony on behalf of the STEEL DESIGNER is that no barge light or lights were seen at any time before the collision. The testimony on behalf of the VIRGINIA was that the barge's running lights and aft white lights were on, and had been burning continuously for about seventy two hours.

There was conflicting testimony as to what lights were burning on the BETH-COAL NO. 1, as to their then efficiency, and as to their original adequacy.

Specifically, the tug master testified that the barge had bright lights, two white aft, and red and green forward. Gibson, the tug's deckhand, stated that immediately before the collision he was unable to see the starboard running light of the barge, but that the port light was lit, as well as the two stern lights. When asked about their brilliance, he replied that: "They don't burn too brightly anyway."

Len, a fireman on the STEEL DE-SIGNER stated that when he went aft after the collision he walked to the bow of his ship on the starboard side where he noticed "a very dim green light at the edge of the barge." He walked to the port side of his ship, and did not see any lights on that side.[14] The green light was the only one he recalled seeing.

The pilot of the STEEL DESIGNER testified in court that after the collision he saw two dim white lights but no red or green lights on the barge.

The captain of the STEEL DESIGN-ER in his deposition was silent on the presence or absence of barge lights after the collision.[15]

Whether the burden be on the VIR-GINIA (Griffin on Collisions, page 234)[16] to prove that the lights on the barge were adequate and if so, whether the burden is shifted or cancelled by the gross fault of the STEEL DESIGNER (The City of New York, 1893, 147 U.S. 72, 85, 13 S.Ct. 211, 37 L.Ed. 84; The Ludvig Holberg, 1895, 157 U.S. 60, 71, 15 S.Ct. 477, 39 L.Ed. 620; Compania Nacional de Navegacao Casteiro Patrimanio v. Cabin Tanker Industries, 4 Cir. 1961, 285 F.2d 592, 594; White Stack Towing Corp. v. Bethlehem Steel Co., 4 Cir. 1960, 279 F.2d 419, 423; Bradshaw v. The Virginia, 4 Cir. 1949, 176 F.2d 526, 530; The Lizzie M. Walker, 4 Cir. 1925, 3 F.2d 921; Skaustrand v. P. W. Thirtle, D.Md. 1964, 227 F.Supp. 281), is not important in the view taken by the Court as to liability, even if the lighting be found to be defective. Considerable testimony was offered as to tests of comparable lights. On a consideration of the manner in which the witnesses testified,[17] their ex-

13. Bethlehem's liability, if any, with respect to the lighting of the barge will be discussed separately.

14. From the sketch Len drew of the angle of the barge and the STEEL DESIGNER he should not have been able to see the barge's red light, no matter how bright it might have been.

15. This, and the absence of any log entries by the STEEL DESIGNER as to the barge lights, or any reference to them in its report to the Coast Guard, will be further considered under the question of liability of the VIRGINIA if the barge lights were in fact inadequate.

16. His statement that the libellant has the burden of proof is neither helpful nor persuasive, since any vessel involved in a collision may be the libellant, or if not, almost surely will be a cross-libellant.

17. Bethlehem's witness Harvey was completely persuasive in his testimony as to tests and their results.

Isthmian's witness Projector had made visual tests on a "search and detect" basis, that is, the intensity at which a light would first be observed by some one busily engaged in many matters, and who "does not know where or when he may find a light."

"The usual thing there is that when you do finally find a light, you ask yourself, 'why didn't I see it before,' because your detection occurs at a level so far above the literal maximum possible, best possible threshold when you do see it, you see it very well."

He testified that on the "search and detect" system the red light would be observed at a distance of one-half to two-thirds of a mile, but that there was no

perience or lack of it, and the circumstances under which the tests were made, the court is of the opinion that the white, green and red lights (lenses, bulbs and batteries) as originally furnished by Bethlehem to Harbor met the statutory requirements of visibility at two miles.

The evidence is also clear that Harbor was given, and exercised the right, to change batteries and bulbs whenever it deemed necessary, and at Bethlehem's expense; and that batteries were changed on the red and green lights every 3–4 trips.

The lamps, and replacement lamps, originally supplied by Bethlehem or by way of replacement, had off and on switches. Harbor rewired these so as to result in the barge lights being on at all times. There is no evidence that Bethlehem knew or should have known of this practice.

There was also considerable evidence that batteries in use constantly lose voltage, with an accompanying diminution in intensity. The adequate correlation between intensity at the end of seventy-two hours, and visibility (not on a search and detect basis) to one on the lookout was furnished. The court therefore concludes that it has not been established that on December 31, 1964, the red and green lights of the barge were visible for at least two miles.[18]

Projector made no test of corresponding white lights.

The Coast Guard either used, or permitted the barge white lights to be used, to mark the location of the partially submerged barge.

■ Even were all the lights on the barge inadequate, the court finds that this was merely a condition, but not a cause, of the collision. The testimony satisfies the court that at all times since 1746, the tug and barge were on the easterly side of Craighill Channel, and in fact, in the extreme easterly part. The pilot of the STEEL DESIGNER himself placed the tug and tow at all times in the channel. He knew that the tug had a tow. He assumed that the tow was following the tug. He assumed that the hawser was 350–400 feet long (in fact 230 feet, giving greater control). He did not consider this to be important.

Moreover, the course recorder of the STEEL DESIGNER strongly indicates that immediately prior to the collision the barge was following a course not more than 5° off true north. At the time of the collision (although the time of collision itself cannot be determined from it) the course of the STEEL DESIGNER was indicated as 200° [19]. If, as the tug captain places it, and as the court accepts the angle of impact was 25°, the deviation of the tug from true

inconsistency between this conclusion, and the testimony of other Isthmian witnesses that on a clear, dark night they had walked away from a similar light, that it was barely visible at 5900 feet and not visible at 6200 feet; nor was it inconsistent with evidence on behalf of Bethlehem that two men had seen a substantially similar light at a distance of two miles.

Although properly referring to lack of knowledge of all conditions, he ascribed it primarily to the fact that the witness knew "when to look."

Projector also testified that the "threshhold illuminants for favorable conditions of observation will be of the order of a tenth or twentieth of the threshold for the search and detect situation"; that is "You can see an amount of light one-tenth as great if under the most favorable

laboratory conditions * * * " as under the search and detect.

In view of the fact that the barge lights were not a "search and detect" case, the photometric measurements to which Projector testified, while perhaps entirely accurate, are of little or no practical significance.

18. Much was sought to be made by Isthmian and Aetna of the non-preservation of the red and green lights. Since the exact condition of the batteries was not known, and since the lamps were an ordinary article of commerce, the court does not attach any special significance to this.

19. This is accepted by Isthmian's expert, Suarez, but is bitterly contested in Isthmian's post trial brief, which seeks to prove, unsuccessfully, that the course at that time, was 180°.

north was approximately 5°. Certainly the barge was not heading East or North; the collision was not with its bow, but its starboard side.

Lights on the barge (or the observation of lights on the barge) would not have added anything of substantial value to the pilot's knowledge of the east-west position of the barge, because he at all times located it, and the tug in Craighill Channel; and he assumed the barge to be following the tug, as in fact it was. Therefore, when he passed the tug safely at some 100 feet, had he been on the proper course (for a starboard to starboard passing) of 180°, he would have missed the barge, whether he saw it or not; whether it was unlighted, or its lights were completely visible. After passing the tug he did not steer to the West, misled by an assumed position of the barge (especially after its illumination by the tug searchlight) but because he tried to pass between the tug and the Eastern edge of the channel, and because of his speed and course and misjudgment of the location of the 16 foot shoal [20] the STEEL DESIGNER was caused to ground, and to swing to starboard out of control, and hit the barge.

The court concludes that it was the gross fault of the STEEL DESIGNER that was the cause of the collision, even assuming the absence of proper light on the barge. If, as the court has found, the white lights on the barge were adequate, the case for non-liability of the VIRGINIA and the BETHCOAL NO. 1 would be even stronger than was true in the case of The Lizzie M. Walker, 4 Cir. 1925, 3 F.2d 921.

This conclusion, that even if the lights of the barge were inadequate, this was not the cause of the collision, is bolstered by the fact that the contention with respect to the barge lights appears to be an afterthought.

(i) The captain of the STEEL DESIGNER appears to have made no in-spection of the barge lights after the collision.

(ii) 46 U.S.C. section 201 Twelfth, provides that:

"In every case of collision in which it is practicable so to do, the master shall, immediately after the occurrence, cause a statement thereof, *and of the circumstances under which the same occurred,* to be entered in the official log book * * * " (emphasis supplied).

The failure to note in the log book the absence of lights is a significant circumstance, tending to discredit the claims of such absence. Socony-Vacuum Oil Co. v. Smith, 5 Cir. 1950, 179 F.2d 672, 675; The Etruria, 2 Cir. 1906, 147 F. 216, 217; The Sicilian Prince, D. C.N.Y.1904, 128 F. 133, 136–137; affd. 2 Cir. 1905, 144 F. 951; The Richmond, D.C.Va.1902, 114 F. 208, 212.

(iii) Isthmian's report to the Coast Guard filed five days after the collision, made no reference to inadequate barge lights, much less classified this as the, or even a, cause of the collision.

(c) The VIRGINIA's assent to a starboard to starboard passing, and failure to pull to port thereafter.

The court has previously held that the STEEL DESIGNER only once requested a starboard to starboard passing, but also held that even if an earlier signal had been given, but was not answered, the STEEL DESIGNER was obligated to take precautionary measures to determine what passing should then be agreed upon.

Isthmian argues that the VIRGINIA at the first two-blast signal (if given) or at the two-blast signal to which the VIRGINIA did respond, should have sounded a one blast port to port signal, or have sounded danger signals. In this connection it must be noted that the most the VIRGINIA could have done was to request the STEEL DESIGNER to recon-

20. Had he not hit the knoll with force sufficient to cause substantial damage to the port bow and bottom of the STEEL DESIGNER he could have gone several hundred feet outside the channel, have passed tug and tow, and returned to the channel without grounding.

sider its (the STEEL DESIGNER'S) procedure.

The VIRGINIA was not "mistress of her motions. She cannot advance, recede or turn either way at discretion * * *" The Syracuse, 1869, 76 U.S. (9 Wall.) 672, 675, 19 L.Ed. 783; The Alleghany, 1869, 76 U.S. (9 Wall.) 522, 524, 19 L.Ed. 781.

A tug "with a tow carried on a tow line can neither stop nor back * * *" Western Transit Co. v. Davidson S. S. Co., 6 Cir. 1914, 212 F. 696, 700, cert. den. 1914, 234 U.S. 764, 34 S.Ct. 998, 58 L.Ed. 1582.

Nor could the VIRGINIA go sharply to port without the great risk of throwing her tow to starboard. The STEEL DESIGNER's course and speed made it highly probable that the only chance for a safe passage (which in fact would have been effected if the STEEL DESIGNER had been able to maintain an 180° course) was for a starboard to starboard passage.

■ The master of the tug had the right to rely upon the ability of the STEEL DESIGNER to carry out the starboard to starboard passage. Acceptance of the starboard to starboard invitation was not, under the circumstances, negligence. See The Cetus, 2 Cir. 1913, 202 F. 189, 191–192; Lehigh Coal and Nav. Co. v. Compagnie Generale Transatlantique, 2 Cir. 1926, 12 F.2d 337, 338; The Titan, 2 Cir. 1892, 49 F. 479, 480.

"We are dealing with a ship which is defending herself against the attack of another vessel that has been guilty of the most glaring departures from the sailing rules. In such a case the law laid down as follows in the City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, 216, 37 L.Ed. 84, many years ago and still in force and effect is applicable:

"'* * * Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor.'" (White Stack Towing Corp. v. Bethlehem Steel Co., 4 Cir. 1960, 279 F.2d 419, 423).

"* * * [T]he burden of justifying a starboard-to-starboard passing rests upon the vessel initiating the same. The Dauntless, 2 Cir., 3 F.2d 529. In the present case that burden has not been met. Furthermore, the vessel initiating the starboard-to-starboard passing assumes the risk of the inability of the vessels to pass in that manner. Belden v. Chase, 150 U.S. 674, [703], 14 S.Ct. 264, 37 L.Ed. 1218." (Harbor Towing Corporation v. Tug Reliance, D.C.E.D.Va.1963, 211 F.Supp. 896, 903).

There was no fault on the part of the VIRGINIA, under the particular circumstances in question, in accepting the starboard to starboard signal of the STEEL DESIGNER, or in maintaining her, and her tow's course within the channel practically due North.

3.    Fault on the part of Bethlehem.

It is claimed that Bethlehem was at fault in originally supplying inadequate lights for the barge and in not seeing that they were properly maintained.

■ a.    The court has already held that the barge lights, as initially supplied by Bethlehem, were adequate. Under the contract with Harbor, Harbor had the responsibility for maintenance of proper lights on the barge, no matter by whom initially supplied. As the contract was effective September 21, 1962, and the collision occurred December 31, 1964, Harbor had ample time to replace the original lights, if they were, or became, defective.

b.    If the barge lights were inadequate at the time of the collision, their condition was not chargeable to Bethlehem. Harbor's contract required it to "maintain all lights aboard the barges. Batteries, lamps and other equipment

necessary to keep the lights working will be procured by Harbor \* \* \* " without any limitation as to kind or source. As was said in the Lizzie M. Walker, 4 Cir. 1925, 3 F.2d 921:

> "The owner of the tug had contracted to transport the scow and to take entire charge of its navigation. Under such circumstances the owner of the scow was responsible for its seaworthiness; the tug was responsible for the navigation of the scow and for placing lights necessary for its safety and the safety of other vessels."

Further, as the Court said in Sturgis v. Boyer, 1860, 65 U.S. 110, 121–122, 24 How. 110, 16 L.Ed. 591:

> "Cases arise, undoubtedly, when both the tow and the tug are jointly liable for the consequences of a collision; as when those in charge of the respective vessels jointly participate in their control and management, and the master or crew of both vessels are either deficient in skill, omit to take due care, or are guilty of negligence in their navigation. \* \* \* But whenever the tug, under the charge of her own master and crew, and in the usual and ordinary course of such employment, undertakes to transport another vessel, which, for the time being, has neither her master nor crew on board, from one point to another, over waters where such accessory motive power is necessary or usually employed, she must be held responsible for the proper navigation of both vessels; and third persons suffering damage through the fault of those in charge of the vessels must, under such circumstances, look to the tug, her master or owners, for the recompense which they are entitled to claim for any injuries that vessels or cargo may receive by such means \* \* \* the

tow, under the circumstances supposed, is no more responsible for the consequences of a collision than so much freight."

Cases such as Horton & Horton, Inc. v. The S. S. Robert E. Hopkins, 5 Cir. 1959, 269 F.2d 914; The Sacony No. 123 2 Cir. 1935, 78 F.2d 536, and American Dredging Co. v. Calmar, E.D.Pa.1954, 121 F.Supp. 255, are not inconsistent or to the contrary. In the first two, the same company owned both the tug and barges. In the third, the owner was using the scows in dredging operations and failed to provide proper lights.

(c) The court has already held that even if the barge lights were inadequate at the time of the collision, this was not a proximate cause of the collision.

There was no fault or liability on Bethlehem, or the BETHCOAL NO. 1, at the time of the collision with respect to the barge lights.

### Limitation of Liability.

Having found that the collision was solely due to fault on the part of the STEEL DESIGNER, there is of course no liability on the part of the VIRGINIA and Harbor to be limited. Should the technical absence of a lookout on the barge; or the absence of adequate lights, or the acceptance of the starboard to starboard invitation, or the maintenance thereafter of its course, be found to have existed, and to have been "faults," they were noncontributory; and in any event would be very "minor" faults compared to the overwhelmingly "major" fault of the STEEL DESIGNER.

Should there be found to be fault with respect to the absence of a lookout on the tug, and/or the barge lights, entailing liability upon the VIRGINIA,[21] Harbor would not be entitled to limit liability. It knew that the crew was inadequate to permit a lookout at all

21. This and the further discussion in the opinion is not to be taken as indicating any uncertainty as to the correctness of the rulings with regard to fault. Recognizing, however, that matters as to which this judge entertains no doubts does not necessarily mean they will always be so interpreted by others, the court felt it proper to state the results of alternative conclusions, however improbable they may appear to be.

necessary times;[22] and it did not familiarize itself with the actual maintenance of the barge lights, or require the replacement of batteries at stated time intervals.

### Cargo Claimants.

Cargo claimants ask for rulings as to their rights under various assumed situations; e. g., limitation of liability, and fault on the part of STEEL DESIGNER, VIRGINIA and BETHCOAL NO. 1; limitation of liability and fault on the part of the STEEL DESIGNER and the VIRGINIA; and exoneration of the owners of the VIRGINIA and BETHCOAL NO. 1 on the major-minor doctrine. The court does not at this time feel called upon to determine rights under three mutually inconsistent situations, none of which would be applicable under the decision herein.

The foregoing embodies the court's findings of fact and conclusions of law. If any party desires further or more detailed (but not inconsistent) conclusions, they may be submitted within fifteen days from the date hereof, after which an appropriate decree will be entered.

---

22. The tug's complement was seven members per trip; two masters, two engineers, two deck hands and a cook. One master, engineer and deck hand stood alternate six-hour watches.