## THE CHARLES MORGAN.

(*District Court, D. Kentucky.* May 3, 1881.)

1. COLLISION—PASSING BOAT.

An approaching and passing boat takes upon herself the peril or determining what is a safe distance in passing another boat going in the same direction, and must bear the consequences of a misjudgment in that respect.

2. SAME—SAME.

In determining the question of distance, however, the passing boat has a right to assume that the other boat is well equipped, and is being managed and run with ordinary care and skill.

SAME—SAME.

After the boat which is being passed has replied to the passing boat's signal in the affirmative, she is bound to continue in her then course, if it can be done without immediate danger to herself or other boats that may be in or along the river.—[ED.

In Admiralty.

*J. K. Goodloe, L. H. Noble,* and *Bentinck Egan,* for libellant.

*Hamilton Pope, James Speed,* and *W. A. Bullitt,* for claimant.

BARR, D. J. The steamer Charles Morgan, running between New Orleans, Louisiana, and Cincinnati, Ohio, left her landing at the former place a few minutes after 5 o'clock A. M. April 24, 1880. The steamer John W. Cannon, then running between New Orleans and Bayou Sara, Louisiana, left her landing a few hundred yards below, shortly after the Morgan, and both boats proceeded up the river. The Cannon, being the fastest boat, soon overtook the Morgan, and in passing in front of a place called the Bull's Head, in the city of New Orleans, the boats collided. The Cannon was disabled by this collision, and her owner, John W. Cannon, has filed this libel against the Morgan, alleging that she ran into the Cannon, and that this occurred by reason of a want of care and skill on the part of the officers and crew of the Morgan, and without the fault of the officers and crew of the Cannon.

The claimant, Thompson, owner of the Morgan, denies in his answer that the Morgan ran into the Cannon, and denies all negligence and want of skill upon the part of the officers

and crew of his boat, and states affirmatively that the collision was caused by the negligence, want of skill, and the improper conduct of the officers and crew having charge of the Cannon. Many depositions have been taken by each party, and, as is usual in such cases, there is much conflict in the statements of the witnesses. The Cannon was the fastest and passing boat; it was, therefore, her duty to pass the Morgan at a safe distance. In considering whether or not it was a safe distance to pass, the officers of the Cannon had a right to assume that the Morgan was well equipped, and was being managed and run with ordinary care and skill. This being assumed, the rule is that the approaching and passing boat takes upon herself the peril of determining what is a safe distance in passing another boat going in the same direction, and must bear the consequences of a misjudgment in that respect.

Judge Betts, in considering the duty of an approaching vessel in the case of the *Steamer Rhode Island*, Olcott, 515, says: "The approaching vessel, when she has command of her movement, takes upon herself the peril of determining whether a safe passage remains for her beside the one preceding her, and must bear the consequences of misjudgment in that respect." See, also, *Oceanus*, 12 Blatchf. 430; *Whitridge* v. *Dill*, 23 Howard, 454.

There is another rule which is material in this connection, and that is: after the boat which is being passed has replied to the passing boat's signal in the affirmative, she is bound to continue in her then course, if it can be done without immediate danger to herself or other boats that may be in or along the river. See Rules 22, 23, 24, and section 4233, Rev. St., and Pilot Rules for Western Rivers, No. 8; *The Grace Girdler*, 7 Wall. 202.

In this case there was a collision, and I should therefore assume the officers of the Cannon had misjudged the proper distance in passing the Morgan, unless they show by the evidence a want of reasonable care or skill upon the part of those in charge of the Morgan. The burden of proving this is upon the libellant. If, however, he proves that the Morgan, after

she answered the Cannon's signal affirmatively, changed her course without immediate necessity, and the collision thereby occurred, he has sustained this burden and his cause, unless the claimant proves this change was the result of causes which reasonable care and skill could not have avoided.

It may be assumed as undisputed in this record that the river at the place of collision was very deep from bank to bank. It was from 1,700 to 1,800 yards in width, and the Orleans shore was lined with shipping. The boats were running at their usual speed—the Cannon at the rate of 12 or 15 miles an hour, and the Morgan at the rate of 10 or 12 miles an hour. The Cannon was 285 feet in length and the Morgan 315. The Cannon had the most power and the Morgan the largest tonnage. The Cannon came up on the larboard side of the Morgan and blew two whistles, which were promptly answered by the Morgan. The Cannon then attempted to pass, and, doing so, the boats collided. The Cannon was injured by having the forepart of her wheel-house broken in, the gallows-frame of her starboard wheel knocked down, and this caused that wheel to drop into the river after she had run a few hundred feet. The Morgan was injured slightly, only about two feet of the house on her larboard side being knocked off. This was some 53 feet back of the flag-staff, and immediately behind the curve which makes the bow of the boat.

The testimony is much too voluminous for me to attempt to review it. I shall content myself with indicating my conclusions upon disputed facts, and briefly the reasons to those conclusions. I think the decided weight of the testimony is that the Morgan changed her course after she replied to the Cannon's signal, and that she ran into the Cannon, and not the Cannon into her.

This conclusion is sustained by all of the officers and passengers of the Cannon who have testified, and by others who were not on the Cannon. I think it is sustained by both of the pilots who were on the Morgan. Mr. Jamison, who was at the wheel of the Morgan, states distinctly he changed the course of the Morgan, and says this was done because of

a high wind blowing towards the Orleans shore. In another place he says this was necessary to avoid a tug and barges which were in front of the Morgan. It is true that he says in his redirect examination that this change was before the signal, but this is unsustained by any other testimony, and there was not the slightest reason for such a change at that time. Mr. Phillips, the other pilot, who was in the wheel-house of the Morgan, says "the Morgan started to go from the shipping—to run from it," when the Cannon was about abreast of the Morgan's pilot-house. The other evidence distinctly shows there was not a high wind blowing to the shore, nor were the tug and barge in the way of the Morgan. This tug was the Mahomet. With a barge in tow she was going up the river, and the decided weight of the testimony is that she was two and a half or three squares above the Morgan, and inside of her course. There was much conflict in the testimony as to the distance the Morgan was running from the shipping at the time the Cannon came up. Captain Albert Stine thinks his boat, the Morgan, was running from the shipping a distance of 125 feet. Other of claimant's witnesses put the distance less, and some of the libellants more. I should think, from all of the evidence, the distance was from 100 to 120 feet. It seems, however, to be the universal testimony that she was sufficiently far from the shipping to be safe if she were not crowded in. Whether she would have been safe had she been crowded in is not material to the present inquiry, because I do not find from the testimony that she was crowded in. The material inquiry is, did the safety of the shipping require that she should turn out from the shore? and I think the evidence proves that it did not. It is quite probable to those on the Morgan, who did not have the opportunity of observing accurately the courses of the boats, it looked as if the Cannon was running across the bow of the Morgan. This would be the appearance from the Morgan, though in fact she might be running towards and into the Cannon; nor is the character of the blows which these boats received inconsistent with the conclusion that the Morgan ran into the Cannon.

It is most probable that the Morgan did not strike the Cannon at the angle which most of the libellant's witnesses say she did. It is probable that the Morgan sheered towards the Cannon at a sharper angle than that at which she struck her. The testimony shows that the Morgan's guards were three feet higher than the Cannon's. It is probable that the Morgan's pilots, both of whom were then at the wheel and using all of their strength, had succeeded in changing her course somewhat, though the change was not sufficient to prevent the higher guards of the Morgan going in and giving the Cannon a sideling blow.

The learned counsel for the claimant, however, insists that even if it be true the Morgan sheered and ran into the Cannon, it was caused by the current or suction produced by the running of the boats in such proximity, and that the Cannon took the risk of this when she selected her distance to pass, and for that reason cannot complain.

There is some evidence tending to sustain this theory, and it has been presented with much ability and ingenuity by the counsel, but my mind does not assent to it.

There is much contrariety of testimony as to how far the Cannon was outside of the Morgan as she came up to pass her. The libellant has taken the testimony of some 17 witnesses upon this point, and the average of these witnesses is 154 feet. The claimant's witnesses put the distance from 25 feet to 200 feet. The average of all the witnesses in the case is about 128 feet.

It is probable that the Cannon was running from 300 to 350 feet from the shipping along the shore, and about 150 feet outside of the course of the Morgan. It is quite clearly proven by many other pilots, whose depositions are taken as experts, that large steamers can and do safely pass within, say from 15 to 100 feet. There is evidence that boats running very close sometimes become locked, but this would indicate that the tendency was to go together broadside, and not across or into each other.

These boats were, say, 150 feet apart. The Morgan is the larger boat, though the Cannon is the faster and the more

powerful. The suction caused by the wheels of each boat would not materially differ. I do not see why they would not about neutralize each other; and, if this were not so, why the suction would not be greatest about and immediately behind the wheels of the respective boats. If this be true, this suction would have a tendency to bring the wheels and sterns of the boats together, and thus throw the bows out, and the power in the boats, if applied, would cause the bows to go from each other. If any collision was caused it would be by the back part of the boats swinging together.

Whatever may be the truth upon this subject, the theory advanced is too shadowy to base a judgment upon. I think the Morgan, after she signaled the Cannon, changed her course without any necessity for so doing. In doing this she violated a well-known and long-established rule of navigation, and is therefore liable for the damage done the Cannon. The case should go to a commission sworn to ascertain and report this damage.