**Complaint of Tug Ocean Queen, Inc., and Red Star Towing and Transportation Company, Plaintiffs, for Exoneration from or Limitation of Liability.**

**TUG OCEAN QUEEN, INC., and Red Star Towing and Transportation Company, as owner and charterer, respectively, of the TUG OCEAN QUEEN, Plaintiffs,**

**v.**

**The TANKER FOUR LAKES, her engines, etc., et al., Defendants.**

**Nos. 69 Civ. 4009, 70 Civ. 754.**

United States District Court,
S. D. New York.

Sept. 12, 1974.

McHugh, Heckman, Smith & Leonard, by Christopher E. Heckman, Stephen J. Buckley, New York City, for plaintiffs.

Kirlin, Campbell & Keating, by Richard H. Brown, Jr., Lawrence J. Bowles, New York City, for defendants.

MOTLEY, District Judge.

### Findings of Fact and Conclusions of Law

On the afternoon of March 12, 1969, the tanker Four Lakes and the tug Ocean Queen, which was towing an oil barge, collided in the East River. As a result of the collision, the master of the Ocean Queen drowned and four of the tug's crew members sustained injuries. The tanker Four Lakes was damaged and the Ocean Queen sank.

Plaintiffs Tug Ocean Queen, Inc., the tug's owner, and Red Star Towing and Transportation Company, the tug's charterer, seek exoneration or limitation from liability. They also seek damages from defendants Tanker Four Lakes, Inc., the tanker's owner, and Texas City Refining, Inc., the tanker's operator. Defendants, in turn, seek damages from plaintiffs.

The Ocean Queen was a diesel powered harbor tug, with 1600 horsepower, 94.1 feet in length, 25.1 feet in breadth and 10.4 feet in depth. The barge was 260′ long and 42′ wide and the tanker Four Lakes is 552.5′ in overall length and 75.3′ in beam. It is powered by turbo-electric engines of 6,000 horsepower.

The Four Lakes, partially loaded with approximately 14,000 tons of heating oil and gasoline, was enroute from New Haven, Connecticut to Albany, New York at the time of the accident. The tug and barge were travelling downstream from 149th Street in the Bronx. (Tr., May 10, 1973, p. 349). The collision occurred in Hell Gate, a turbulent area south of Wards Island.[1]

The events immediately preceding the accident can be briefly described. The Four Lakes was manned by a pilot, a master, a deck watch officer, a helmsman, an able bodied seaman, a chief officer, a watch engineer and a first assistant engineer. (See Def. Exh. A–H). While the pilot had had extensive experience in Hell Gate, (Tr., May 9, 1973, p. 63), he had not previously piloted the Four Lakes. (Tr., May 9, 1973, p. 91). Nor had he any experience with westbound loaded tankers. (Tr., May 9, 1973, p. 140).

The tug had a master, mate, deckhand, engineer and cook on board at the time of the accident. (Tr., May 9, 1973, p. 47). The barge was apparently unmanned.

At about 1500 hours (3:00 P.M.), after rounding North Brothers Island, the Four Lakes sighted the tug and barge about one mile ahead approaching Hell Gate. The tug and barge were proceeding down river, in the same general direction as the Four Lakes. (Tr., May 9, 1973, pp. 64–66). The weather was fair and visibility was clear. The wind was from the northwest at about 15 knots. (Tr., May 9, 1973, p. 64). The vessels were travelling against the current.

On sighting the Ocean Queen, the Four Lakes, which had been proceeding

---

1. For locations referred to in these Findings of Fact and Conclusions of Law, see Def.Exh.T.

The location of the collision is indicated on Pl.Exh. 3.

full speed ahead, reduced speed to dead slow to avoid overtaking the tug and barge in Hell Gate. Capt. Wells testified that he wanted the Ocean Queen to pass through Hell Gate before the tanker encountered her. Capt. Wells apparently recognized that because of the turbulence of the waters in Hell Gate, any attempt to pass the tug in Hell Gate would be more difficult than a pass farther down the East River. (E. g., Tr., May 9, 1973, p. 145).

The tanker proceeded at slow speed from off North Brothers Island to abreast of the sludge plant on Wards Island whereupon the Four Lakes sounded one long blast to alert ships approaching from the opposite direction around the bend. 33 C.F.R. § 80.5(a). The tug and barge were not then in sight since they had gone around Negro Point. (Tr., May 9, 1973, p. 68). No reply was heard. According to defendants, the tanker then increased engine speed to half ahead for better maneuverability. When it reached a position under the Triborough Bridge at approximately 1517 hours, the tug and barge were again in sight on the north side of the channel, about three ship lengths distant. The Four Lakes sounded a second single "bend" blast signal and heard no reply. (Tr., May 9, 1973, pp. 69–70). Shortly thereafter, when about a ship length behind the tug and barge, (Tr., May 9, 1973, p. 75), the pilot of the Four Lakes sounded a two short blast signal indicating a desire to pass on the port side of the tug and barge, in accordance with 33 U.S.C. § 203, 33 C.F.R. § 80.6(a). The testimony is conflicting on whether the Ocean Queen assented to the pass by sounding two short blasts. 33 U.S.C. § 203, 33 C.F.R. § 80.6(a). Capt. Wells, pilot of the Four Lakes, testified on the trial that he did not hear any answering blasts, (Tr., May 9, 1973, p. 72), as did the Four Lakes' deck watch officer (Defs. Exh. B, p. 15) and chief officer (Defs. Exh. E, p. 4) in their testimony before the Coast Guard. However, in testimony before the Coast Guard, a seaman on board the bow of

the Four Lakes stated that he did hear the Ocean Queen answer with two short blasts. (Defs. Exh. D, p. 4), and a deckhand on the Ocean Queen testified that, while he was not certain that his vessel answered the tanker's two blasts, he heard two blasts, presumably from the Four Lakes, followed shortly thereafter by two blasts which "sounded a little different." (Pls. Exh. 7, p. 122).

It is undisputed that the Ocean Queen did not sound the four blasts which would have indicated that its captain did not think it safe for the tanker to attempt to pass at that point. 33 U.S.C. § 203, 33 C.F.R. § 80.6(a).

Pilot Wells of the Four Lakes then ordered the tanker's engine full ahead and ordered a hard left rudder in order to turn to port close to Hallet's Point and pass on the port side of the tug and barge. (Tr., May 9, 1973, pp. 73–74). However, as the Four Lakes was proceeding to overtake the tug and barge, which were approximately a ship length ahead, Wells observed a slight change in the course of the tug and barge towards the Four Lakes. He immediately sounded a second two short blast whistle signal but heard no reply. The tug and barge, turning sharply left, then came swiftly across the Four Lakes' bow and into collision, the Four Lakes' stern in contact with the tug's port side at an angle of approximately 45 degrees. (Tr., May 9, 1973, pp. 76–84, 198). At the time of collision, the waters were at flood tide and the predicted velocity of the current in Hell Gate off Mill Rock was 2.18 knots. (Defs. Exh. U).

### Fault on the Part of the Tanker

Plaintiffs claim that the collision was caused by 1) the tanker's overtaking the tug and barge without having first received the assent of the overtaken vehicle, (33 U.S.C. § 203; 33 C.F.R. § 80.-6(a)); 2) the tanker's negligent navigation in failing to make the turns required to round Hallets Point; 3) the tanker's negligent navigation in attempting to overtake the tug and barge in Hell Gate; 4) the failure of the tank-

er to keep out of the way of the over-taken vessel, (33 U.S.C. § 209); and 5) the failure of the tanker to slacken its speed or stop or reverse. (33 U.S.C. § 208).

■ The court finds that the tanker Four Lakes was at fault and that its fault contributed to the accident. "In the event of collision, the burden rests upon the overtaking vessel to excuse herself from fault." J. Griffin, *The American Law of Collision*, 171 (1949). Defendants failed to meet that burden.[2] The court will now consider each of plaintiffs' contentions in turn.

1. *33 U.S.C. § 203*

■ The statute provides in part that if the vessel astern ". . . shall desire to pass on the left or port side of the vessel ahead, she shall give two short blasts of the steam whistle as a signal of such desire, and if the vessel ahead answers with two blasts, shall direct her course to port . . .." *See also* 33 C.F.R. § 80.6(a).

The court finds that the tug did assent to the pass. The testimony on this point was conflicting.[3]

One witness, Pilot Wells, testified before the court that he did not hear an assent. However, a seaman on board the bow of the tanker testified during the Coast Guard examination that he did hear an assent and it is likely that he was in a better position to hear the answering signal than was the pilot.[4] Moreover, the able bodied seaman's testimony was corroborated by the testimony of the Ocean Queen's deckhand.[5]

Finally the court is more persuaded by affirmative testimony that the assenting blasts were sounded than by testimony that the answering blasts were not heard, since the latter testimony might have been the product of a failure to hear blasts which were, in fact, sounded.

2. *The Tanker's Negligent Navigation in Failing to Make the Left Turn Required to Round Hallets Point.*

■ The court agrees with plaintiffs' contention that because the Four Lakes did not navigate properly when approaching Hallets Point, it continued straight ahead to near the left (port) side of the Ocean Queen which had made the port turn and was navigating to enter the straightaway below Hell Gate.

Defendants' witness, Vincent B. Sweeney, a fireboat pilot since 1959, who witnessed the collision, testified that the proper heading for a vessel westbound against the flood current, after passing under the Triborough Bridge, was a right (starboard) turn to head toward Mill Rock and then a left turn to head down toward the west channel. (Tr., May 10, 1973, pp. 207–10). The right turn toward Mill Rock was necessary because of the effect of the tide close to Hallets Point on the left bow of the tanker described by plaintiffs' expert. The effect of the tide is to make the turn around Hallets Point more difficult. (Tr., May 10, 1973, p. 286). However, according to the diagram prepared for the Coast Guard investigation by Capt. Wells, the Four Lakes' pilot, the tanker did not make the necessary right turn but instead proceeded straight from the Triborough Bridge to the point of collision. (Defs. Exh. O).

It is likely that if the taker had made the required turn, it would have been more maneuverable and would not have attempted to pass the tug and barge at such close and dangerous proximity.

---

2. Even if the burden were on plaintiffs to show that the collision was at least partly the tanker's fault, the court finds that plaintiffs satisfied their burden. See pp. 1065–1067, *supra.* .

3. The court might have been better able to determine whether the assenting blasts were sounded if the parties had not relied so heavily on the testimony taken before the Coast Guard.

4. The seaman was stationed on the bow and, therefore, was somewhat closer to the tanker than were those on the bridge.

5. See p. 1065, *supra.*

### 3. The Tanker's Negligence in Attempting to Overtake the Tug and Barge in Hell Gate.

■ In any event, the tanker should have avoided overtaking the tug and barge in Hell Gate.

The court found persuasive the testimony of plaintiffs' expert, Frank Johansen, a retired pilot. Capt. Johansen had forty years' experience in navigating through Hell Gate. He testified that because of the strong tide and the sharp bend in the channel, it was unsafe to attempt to overtake a tug and a large barge in Hell Gate. (Tr., May 10, 1973, pp. 283, 339).[6] Instead, the Four Lakes should have held back before it reached Hell Gate.[7]

It is apparent that Capt. Wells was not able to hold back until the tug and barge had left Hell Gate as he had intended,[8] because once he had gone too far downstream, he had to increase his speed in order to improve maneuverability.[9]

In the alternative, once the tanker was near the tug and barge in Hell Gate, it should have stayed back until the tug and barge left Hell Gate.[10]

By attempting a dangerous pass, the tanker further breached its statutory duties to ". . . keep out of the way of the overtaken vessel," 33 U.S.C. § 209, and, on approaching the tug and barge, ". . . if necessary, [to] slacken her speed or stop . . . ." 33 U.S.C. § 208.

■■ The breaches described at pp. 1066, 1067, *supra*, cannot be excused by the tug's assent to the pass. *Charles Warner Co. v. Independent Pier Co.*, 278 U.S. 85, 49 S.Ct. 45, 73 L.Ed. 195 (1928). Nor can there be any doubt that these breaches contributed to the collision.

### Fault on the Part of Tug

Defendants claim that the collision was caused by 1) the tug's agreeing to the tanker's passing and not sounding a danger signal, assuming that the pass was dangerous (33 U.S.C. § 203; 33 C. F.R. § 80.6(a)); 2) the tug's turning to its left across the center line of the channel and crowding upon the course of the Four Lakes (33 U.S.C. § 203); 3) the tug's failing to remain on the right hand side of the channel (33 U.S.C. § 210); 4) if the tug did not hear the tanker's signals or observe the tanker's presence, its failing to keep a proper lookout. (33 U.S.C. § 221); and 5) the tug's inability to maneuver properly either because its engine had malfunctioned or because it was pulling too heavy a load.

### 1. 33 U.S.C. § 203

■ Plaintiffs acknowledge that the tanker's proposed pass was dangerous. Indeed, this is the principal theory on which plaintiffs have proceeded in this case. It follows that the tug violated 33 U.S.C. § 203 when it assented to the tanker's proposal. *E. g., The Varanger*, 50 F.2d 724 (4th Cir. 1931); *The Lehigh Valley No. 142*, 35 F.2d 707, 708–09 (2d Cir. 1929).[11]

■ However, this breach of the statute could not have contributed to the col-

---

6. Capt. Wells, the tanker's pilot, similarly testified that a pass in Hell Gate was difficult. See Tr., May 9, 1973, p. 145.

7. See Tr., May 10, 1973, p. 283.
The furthest point at which Johansen would have stopped is indicated on Def.Exh.T.

8. See p. 1064, *supra*.

9. See p. 1065, *supra*.

10. Capt. Wells, pilot of the Four Lakes, testified that this would have been possible, prior to the time he put the engine on full speed. (Tr., May 9, 1973, p. 73).

11. While *Warner Co. v. Independent Pier Co.*, 278 U.S. 85, 49 S.Ct. 45, 73 L.Ed. 195 (1928), contains language to the effect that an assenting vehicle obligates itself only to do nothing to thwart the overtaking vessel and that it knows of no circumstances not open to the observation of the overtaking vessel which would prevent a safe pass, the language was broader than the facts of the case required. *The Lehigh Valley No.*

lision since the tanker's pilot did not hear the assent. Therefore, the tug's sounding of the two blasts could not have contributed to the pilot's decision to overtake the tug.

■ Nevertheless, failure to sound the danger signal of four blasts, was likewise a breach of the statute, *see Union Oil Co. of California v. The M/V Issaquena*, 470 F.2d 875 (5th Cir. 1973); *Sinclair Refining Co. v. The Morania Dolphin*, 170 F.Supp. 586, 589 (S.D.N. Y.), *aff'd*, 272 F.2d 192 (2d Cir. 1959), and this breach may have contributed to the accident. Capt. Wells testified that, had the tug sounded the four blasts, he would not have attempted the maneuver. A vessel which has violated a statutory rule must show that its fault could not have been one of the causes of the collision. *The Pennsylvania v. Troop*, 86 U. S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1874). *See also In re Seaboard Shipping Corp.*, 449 F.2d 132, 136 (2d Cir. 1971), *cert. denied*, 406 U.S. 949, 92 S. Ct. 2039, 32 L.Ed.2d 337 (1972). While there was also testimony that, by this time, the tanker could not have avoided overtaking the tug, (Testimony of Tanker's Master, Defs. Exh. A, p. 31, and Chief Officer, Defs. Exh. E., p. 15), the court cannot conclude that plaintiffs have established that the statutory breach could not have contributed to the accident.

Nor can the court conclude, with the degree of certainty required by *The Pennsylvania*, that the tanker's master would not have been able to hear the four blasts, had they been sounded.

■ 2. *"The vessel ahead shall in no case attempt to cross the bow or crowd upon the course of the passing vehicle."* 33 U.S.C. § 203, Rule VIII.

*"Where, by any of these rules, one of the two vessels is to keep out of the way, the other shall keep her course and speed."* 33 U.S.C. § 206.

". . . [A]fter the boat which is being passed has replied to the passing boat's signal in the affirmative, she is bound to continue in her then course, if it can be done without immediate danger to herself or other boats that may be in or along the river." *The Charles Morgan*, 6 F. 913, 914 (D.Ky.1881). The overtaken vessel has the burden of proving that a sudden change of course was necessary. *The Corsica*, 76 U.S. (Wall.) 630, 632–33, 19 L.Ed. 804 (1870).

Here, there was evidence that the tug and barge, when turning around Hallets Point, were in the usual position, (Tr., May 10, 1973, p. 215), and that it was necessary to turn left to come around Hallets Point. (Defs. Exh. B, p. 12). However, plaintiffs' expert, Capt. Johansen, testified on cross examination that there was nothing to prevent the tug from navigating on the right hand side of the channel. (Tr., May 10, 1973, p. 300). Plaintiffs failed to satisfy their burden of proving that it was necessary for the tug to have turned so sharply leftward.

3. *33 U.S.C. § 210.*

In view of the court's findings at p. 1068, *supra*, it is not necessary to decide whether the tug violated the Narrow Channel Rule.

4. *33 U.S.C. § 221.*

This section provides in part:

"Nothing in these rules shall exonerate any vessel . . . from the consequences . . . of any neglect to keep a proper lookout . . . ."

■ Defendants argue that ". . . the tug Ocean Queen should be condemned for failure to keep a proper lookout . . . if the court concludes that the master of the Ocean Queen did not hear the Four Lakes' sig-

---

*142, supra,* which states the law of our circuit, held the overtaken vehicle at fault for assenting to a pass which the overtaking vehicle should have known to be dangerous. (The court noted, however, that the overtaken vessel was in a better position to appreciate the danger of the pass than was the overtaking vehicle).

nals or observe the presence of the Four Lakes and her apparent course." (Post-Trial Memorandum in Behalf of Claimants-Defendants . . ., p. 24). The overtaken vehicle ordinarily has the right to rely on its privilege and is not bound to look behind or to take any steps to avoid collision. *The S & H No. 2, Inc.*, 119 F.2d 666, 667 (2d Cir.), *cert. denied*, 314 U.S. 660, 62 S.Ct. 115, 86 L.Ed. 529 (1941). However, here, the overtaken vessel, aware of the presence of the passing vessel,[12] was under a duty not to change its course, if the alteration would threaten a collision and the change was avoidable.

The court is of the view that the tug, having agreed to the pass, was under a duty to make sure that its leftward turn was safe. It appears from the evidence that the tug, not having on board a crew member whose duties were principally limited to those of a lookout, *The Supply No. 4*, 109 F.2d 101, 103 (2d Cir. 1940), was unaware of the precise course of the tanker. This may have contributed to the tug's decision to agree to the proposed pass and its failure to sound the danger signal, and may also have contributed to its decision to turn suddenly to the left. Under the rule of *The Pennsylvania, supra*, the tug is liable for the failure to have a proper lookout, since the failure may have caused the collision.[13]

5. *The Tug's Inability to Maneuver Properly.*

Defendants contend that the tug turned sharply to the left either because its engine had malfunctioned and, therefore, the tug could not maneuver properly or because the barge was too heavy.

The court finds that the tug made its sharp leftward turn because it was not able to control its barge properly. The descriptions of the eyewitnesses make it appear most probable that the tug turned left in an effort to control the barge (E. g., Defs. Exh. B, pp. 9–10; Defs. Exh. D, p. 8).

However, there is insufficient basis for a conclusion as to whether this was a result of an engine malfunction or a negligent overloading of the barge, or some combination of the two. While there was testimony that the tug's engine was overheated and that, consequently, the revolutions had to be reduced, (Tr., May 10, 1973, p. 351), and that the engine had last been overhauled three years earlier, (Tr., May 10, 1973, p. 356), there was also testimony that everything had been running fine. (Tr., May 10, 1973, p. 353). Even if, as a result of a malfunction, the engine was overheated and the revolutions had to be reduced, the court cannot conclude that the tug was rendered unable to pull an ordinary cargo. Nor was there any evidence that the cargo being pulled was beyond the capacity of a tug of the Ocean Queen's size or horsepower. At most, the court can conclude, from the descriptions of the tug's movements just prior to the collision, that it is most likely that the tug's engine had malfunctioned or that the tug was pulling an ex-

---

12. The tug was obviously aware of the tanker's presence, since, as the court has found, it assented to the tanker's proposed overtaking.

13. The court finds at p. 1069, *supra*, that it is most likely that the tug turned sharply to the left either because its engine malfunctioned or because it was pulling an excessive cargo. Therefore, it is improbable that the collision could have been avoided even if there had been a proper lookout.

However, a violation of the statute having been shown, the burden was on plaintiffs to show that the tug's fault "could not have been one of the causes of the collision." *The*

*Pennsylvania, supra*, 86 U.S. (19 Wall.) at 136, 22 L.Ed. 148. Plaintiffs failed to satisfy that burden.

There has been no showing that an engine malfunction or an overloading of the barge was a *certain* cause of the collision or that these conditions made a collision unavoidable. *See also British Columbia Mills, Tug & Barge Co. v. Mylroie*, 259 U.S. 1, 7, 42 S.Ct. 430, 432, 66 L.Ed. 807 (1922): "Every doubt as to the performance of the duty [of the lookout], and the effect of nonperformance, should be resolved against the vessel sought to be inculpated until she vindicates herself by testimony conclusive to the contrary."

cessive cargo, or both, and that, as a result, the tug turned sharply to the left and collided with the tanker.

### Petition for Exoneration or Limitation of Liability

Plaintiffs are not entitled to exoneration for the reasons stated at pp. 1067–1069, *supra.*

■ Plaintiffs also seek, pursuant to 46 U.S.C. § 183(a), a limitation of their liability to the value of their interest in the vessel now pending. They are entitled to limitation only if the faults attributable to their tug were without their "privity or knowledge." 46 U.S.C. § 183(a).

The burden is on the petitioner for limitation of liability to establish lack of privity or knowledge. *E. g., Coryell v. Phipps*, 317 U.S. 406, 409, 63 S.Ct. 291, 87 L.Ed. 363 (1943).

■ If the owner is a corporation, limitation can be defeated only if the privity or knowledge is that of a managing officer of the corporation. *Craig v. Continental Insurance Co.*, 141 U.S. 638, 646, 12 S.Ct. 97, 35 L.Ed. 886 (1891).

■ With respect to the tug's fault in not having a proper lookout, the president of the Red Star Towing and Transportation Company, testified that whether to assign one of the crew members to serve as a regular lookout was left to the master. (Tr., May 9, 1973, p. 49). However, "[i]t is the non-delegable duty of a private shipowner to man his ship with competent officers and crew." *Petition of United States*, 178 F.2d 243, 252 (2d Cir. 1949). The tug's owner could not delegate to the master the duty to decide when a lookout would be required. Indeed, it appears that the effect of this delegation was that in clear weather, it was the practice not to have a lookout. (Tr., May 10, 1973, p. 367). The court need not decide if, in view of the testimony of the deckmate, Thomas

Curry, the corporation's managing officers had constructive notice that lookouts were not assigned in clear weather and if constructive notice would be sufficient to defeat the petition for limitation.

■ Moreover, the court has found that the collision was caused, at least in part, by an engine malfunction or the carrying of an excess cargo. With respect to the engine malfunction, "[t]he corporate owner's duty to make the vessel seaworthy, at least to the point of providing it with sufficient integrity to meet the ordinary perils of the sea, is not delegable to anyone." *Federazione Italiana Dei Corsorzi Agrari v. Mandask Compania de Vapores, S. A.*, 388 F.2d 434, 439 (2d Cir.), *cert. denied*, 393 U.S. 828, 89 S.Ct. 92, 21 L.Ed.2d 99 (1968). There is no evidence that the managing officers took any steps to make sure that the tug was seaworthy.[14] Nor did plaintiffs satisfy their burden of showing lack of privity or knowledge with respect to any overloading of cargo. Mr. Sanders' testimony that the tug had safely pulled other vessels of the same size as the oil barge it was pulling at the time of the collision was insufficient.

The court notes that, since the precise cause of the tug's sharp leftward turn is uncertain, plaintiffs had the burden of proving lack of privity and knowledge with respect to at least the most likely causes—failure to maintain a proper lookout, a mulfunctioning engine, and excessive cargo.

### Summary

■ Both the tanker and tug were at fault. The property damages must, accordingly, be divided equally. *E. g., Reliable Transfer Co., Inc. v. United States*, 497 F.2d 1036, at p. 1038 (2d Cir. 1974).

Plaintiffs' petition for exoneration and for limitation of liability is denied.

---

14. Robert W. Sanders, president of the Red Star Towing and Transportation Co., testified that he did not know when the tug's engine was last overhauled.