**Complaint of B.F.T. NO. TWO CORP. as Owner, and Boston Fuel Transportation Inc., as Chartered Owner and Operator of the TUG HARBOR STAR, for Exoneration from and Limitation of Liability.**

Civ. A. No. 74–391.

United States District Court,
E. D. Pennsylvania.

Opinion April 19, 1977.
Supplemented June 30, 1977.

Raymond T. LeTulle, Philadelphia, Pa., for plaintiff.

Alfred J. Kuffler, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

HUYETT, District Judge.

Judge Learned Hand once wrote:

Masters who choose to divine the purposes of other vessels and keep on, may avoid the charge of overcaution, but they take their chances. If they escape, well and good; if they fail, their owners pay.

*A. H. Bull S.S. Co. v. United States*, 34 F.2d 614, 616 (2d Cir. 1929). This case attests to the continuing vitality of Judge Hand's admonition: the facts reveal that sailors continue to take chances and the resolution evidences that their owners continue to pay.

At 0138 on the morning of September 13, 1973, the S.S. Santos, a tanker owned by Tankore Corporation (Tankore), collided on the Delaware Bay with a barge which was being towed by the Harbor Star, a tug owned by B.F.T. No. Two Corp. (BFT) and operated by Boston Fuel Transportation, Inc. (Boston Fuel). Plaintiffs, the owner and the operator of the Harbor Star, brought this action for exoneration from or limitation of liability. Tankore, owner of the S.S. Santos, entered the case as a claimant, and in addition the owner of the barge, the United States, asserted a cross-claim against Tankore. The government eventually relinquished its cause of action against Tankore for $247,500. As claimant, Tankore seeks to recover from plaintiffs BFT and Boston Fuel the amount paid in settlement to the United States, the owner of the barge, and for the damage sustained by the S.S. Santos.

Both claimant and plaintiffs contend that the collision was attributable solely to the fault of the other vessel. Alternatively, each alleges that any fault on its part was minimal compared with that of the other vessel.

After considering the stipulations agreed to by the parties, the proposed Findings of Fact and Conclusions of Law, the exhibits admitted into evidence, the testimony at trial and post-trial briefs, we make the following Findings of Fact and Conclusions of Law in accordance with Fed.R.Civ.P. 52(b). For ease of understanding, we choose to document our Findings of Fact and Conclusions of Law in narrative form rather than in separately numbered paragraphs.

## FINDINGS OF FACT

I. Tug Harbor Star.

The tug Harbor Star is a diesel powered, uninspected towing vessel, which flies the American flag. She is 87′9″ in length and has a beam of 24 feet. She was purchased by BFT in December, 1972 for $52,500. At all material times, she was equipped with radio transmitter, compass, radar and whistle in the wheelhouse. None of this equipment was situated at the aft control station, but there was a radio speaker in the galley which could be heard by someone manning the aft controls. (Exs. P–11D, P–11B).

Boston Fuel owns all the stock of BFT which is the titled owner of the tug. Both companies have common directors and stockholders. Pursuant to an oral agreement, Boston Fuel operates the tug, meaning that it supplies a crew, fuel, insurance and work for the tug on behalf of BFT. All income generated by the tug is credited directly to BFT and all expenses directly

attributable to the tug are credited directly to BFT. At the end of each calendar year, BFT pays Boston Fuel a 15%–20% operating fee based upon the gross income generated by the tug.

On September 7, 1973, John Curry, dispatcher for Boston Fuel, received a call seeking a tug to tow a Navy houseboat from Boston to Philadelphia, a distance of 472 miles. The job was accepted and the following terms were agreed to: (1) the tow would be picked up in the Navy Yard in Boston on September 10; (2) the fee would be $75 per hour portal to portal (round-trip); and (3) the Navy would supply the running lights on the barge.

When the tug left Boston bound for Philadelphia she was manned by a seven-man crew: Captain MacDonald, Thomas Balcom, two engineers, two deckhands, and a cook. No decision had been made about the status of the crew and tug upon arrival in Philadelphia. The crew might have stayed over in Philadelphia for several days awaiting a return tow or a replacement crew might have relieved the original crew if a return tow could have been arranged for immediate departure.

The tug Harbor Star picked up the tow on September 10, 1973. The tow measured 261 feet long, 48 feet in beam and 40–50 feet high. The lights which were supplied to the tow by the United States Navy consisted of a 10 point green starboard running light, a 10 point red port running light, a 12 point white stern light and a 20 point forward white light. In addition, a forward strobe light was provided as a safety device which would signal if the barge began taking water.

The tug set off from Boston and proceeded down through the Cape Cod Canal and Long Island Sound. With the tow on a 1200 foot hawser, the Harbor Star continued down the New Jersey coast and entered Delaware Bay at about 0024 on the morning of September 13th. The night was clear with a full moon and visibility was at least 10 miles. In the bay, a 15 knot wind was blowing from the northeast and the current was running towards the southeast at about 1½ knots. As he entered the Delaware Bay, Tom Balcom spoke on the telephone with the Philadelphia Pilots' station. He was informed that there were several outgoing ships, but no mention was made of any incoming traffic.

The tug proceeded up to the east of the Brandywine Range, the deep water channel leading to the Delaware River up to the port of Philadelphia. When she arrived on the east side of the Delaware Bay one-half to three-quarters of a mile west of buoy R–2 and about 3 miles below buoy R–9 at Brown's Shoal, (Ex. P–10, point marked P–5) the tug stopped to shorten her hawser down from 1200 feet to the 200–300 feet needed for safe towing in the narrow confines of the Delaware River. This locale was known among seamen as a place often used for shortening up. (Ex. C–31, p. 24).

At 0119 the shortening-up process was commenced. No one was specifically appointed as a lookout during shortening up, but there were three men, Tom Balcom and two seamen, on the stern of the tug occupied with bringing in the hawser. Captain MacDonald was overseeing the operation from the aft steering station. During the shortening-up process or immediately before its commencement, two white lights were spotted on the horizon. The Captain checked the radar which was on a six-mile range and saw nothing. Two further checks of the radar by Captain MacDonald revealed nothing astern. (N.T. 243–44)

At 0137, when the hawser had been shortened to about 300 feet, the men on the tug espied the stem of the Santos off their starboard aft, approximately 400–500 feet from the barge. No whistle or radio contact was initiated by either vessel at this time. At 0138, the Santos' stem collided with the tow just forward of amidships. The impact pulled about 600 feet of the hawser line out before the seamen on the tug had an opportunity to cut the hawser.

Following the collision, the tug went alongside the barge and secured it. Subsequently, the barge was picked up by the Judy Moran and taken into Philadelphia. Undamaged by the collision, the Harbor Star left Delaware Bay at about 1410 on the 13th heading for Boston. After a stop in New London, Connecticut, the tug arrived in Boston at approximately 2300 on the evening of September 15, 1974.

## II. Santos.

The S.S. Santos, a Liberian flagship, is owned by Tankore. The vessel, a tanker 639'7" in length, 80'5" across the beam and weighing 45,000 tons, was transporting a cargo of heating oil to Philadelphia.

Early on the morning of September 13th, the Santos was steaming toward the Delaware Bay to take a pilot on board to guide her up the Delaware River to Philadelphia. At about 0020–0025, Captain Cano on the Santos spotted a tug showing two or three towing lights. He first attempted to fix the tug with binoculars, but because of excessive glare, he continued his observation without the binoculars. The tug was bearing about 20 degrees to the Santos and the Captain estimated that it was six miles away. He looked at the radar at that time and was able to ascertain only one target on the screen.

At 0047, the Santos stopped in the pilot area to pick up Captain Orton, a duly licensed Delaware River pilot. When the pilot entered the bridge, at least 4 other persons were present: the seaman on watch at that time, the helmsman, the second officer, and Captain Cano. Shortly after entering the bridge, Captain Orton observed the tug showing three towing lights, bearing about 20 degrees off his starboard bow. He checked the radar, which was operating on a four-mile range, and only saw one pip near the outside of the ring. Subsequently, no constant radar watch was maintained, although the second officer checked it sporadically. Two targets, signifying a tug and tow, were never observed on the radar screen.

Subsequently, the pilot took the conn and brought the vessel to a course of 337°, heading for the entrance to the Brandywine Range. The tanker's engines were operating properly. (Ex. C–29, p. 9; Ex. C–25, p. 83–84). At 0048, the engines were put on half ahead. At 0052, the engines were advanced to full ahead where they remained until about one minute before the collision. At full ahead, the Santos made 7–8 knots over the ground after deducting the 1½ knot ebb current against which she was proceeding.

Several minutes before the collision, the pilot observed that the Santos' course was going to take her within 300 feet of the stern of the tug. The Santos altered her course to the left to about 335° to allow for 500 feet of clearance between herself and the tug.

From approximately 0100 onward, the helmsman, watch and pilot had the tug under observation. The bearing of the tug remained between 6°–10° off the Santos' starboard bow, but the distance between the two ships kept closing. (C–25, p. 47, 52, 55, 57). No attempt was made by the Santos to call the tug and the Santos never sent any whistle signals reflecting an intention to pass.

Between 0118 and the time of the collision at 0138, Captain Cano left the bridge twice. At 0118 he went below to advise the port engineer that they were proceeding directly to Philadelphia. After returning to the bridge for several minutes, Captain Cano went below to his quarters to check his computations on the ship's draft since that was crucial to the Santos' navigation up to Philadelphia. While in his quarters, he viewed the tug's lights at least once prior to his first observation of the barge.

The helmsman, watch, second officer and pilot all spotted the tow at approximately the same time. They first identified a green light which was about 1000 feet away. This green light was the starboard light of the tug's tow. Captain Cano was below at this time in his office, but he also

first observed the green light at about the same time. When Captain Orton saw the light nearly dead ahead, he ordered the wheel hard to port and a stop engines. The pilot then proceeded out to the starboard wing where he attempted to blow a passing signal on the ship's whistles, but they did not work. At 0138, notwithstanding the fact that the bow of the Santos had started to swing to port, the stem of the Santos collided with the starboard side of the barge. Following the impact, the starboard side of the tow passed down the portside of the Santos.

At 0159, the Santos anchored in the following position: 3.6 miles, bearing 350°T to Buoy 9, and bearing 024°T, distance 2.05 miles, to the upper end of the Harbor of Refuge breakwater.

III. Location of the Collision.

Tankore avers that the collision occurred west of the track to the Brandywine Range, while the plaintiffs contend the situs is east of the entrance to the Range. The situs of the collision is important since it will in part determine the degree of the Harbor Star's culpability. If the Harbor Star permitted the barge to drift across the shipping entrance without taking care to determine its position, then the tug's share of any fault apportioned pursuant to *United States v. Reliable Transfer Co.,* 421 U.S. 397 (1975), may be increased.

In support of its contention that the collision occurred east of the track to the Brandywine Range, the plaintiffs rely upon the testimony of Captain MacDonald, the master of the tug, that he felt that he had drifted about a mile to the west while shortening up. (N.T. 259–60, 284). This would still place the tug and barge east of the entrance to the Brandywine Range. The Captain further stated that he was "jogging up" the tug's engines at this time. (N.T. 252). The Captain and mate testified that they thought they were still to the east of the track because they were still within

the red sector of the Brandywine light. (Ex. P–10) (N.T. 215, 361).

The claimant, Tankore, contends that during the 20 minute shortening-up period, the tug and barge drifted approximately three miles and thus were situated to the west of the track. To prove this contention, it relied upon the expert testimony of Anthony Suarez who reconstructed the path of the ship up the Delaware Bay from the course recorder, a device which records the gyro heading of the ship as a function of time. (Exs. C–7, C–23). Suarez' reconstruction of the ship's path places the collision to the west of the track to the Brandywine Range. (Ex. C–24, point marked collision). His reconstruction, however, is dependent upon several other pieces of evidence, including: (1) Captain Cano's testimony regarding where the Santos picked up the pilot, and (2) where and how the Santos anchored following the accident. In other words, the path which he charts is relative only to fixed points where the path beings and ends. If either of these points are changed, or the manner and speed in which they are arrived at is altered, his calculation as to the situs of the collision must also change. There is conflicting testimony with regard to these variables.

First, Captain Orton's testimony about where he was picked up in the Pilot Area contradicts Captain Cano's testimony. The Santos' master, who had only been in the Delaware Bay as a master two or three times before (Ex. C–25, p. 123–24) placed the pick-up point in the western portion of the Pilot Area (Ex. C–2, point marked Pilot). Captain Orton, who had been piloting ships up and down the Delaware for more than 20 years, placed the pick-up point in the eastern portion of the Pilot Area. (Ex. P–9, point marked XA).

In addition, the accuracy of Suarez' calculations is contingent upon his reconstruction of how the Santos arrived at its anchoring position at which bearings were taken. The ship keeps a bell book on the bridge and a bell book in the engine room—each time an

order is given from the bridge to the engine room it should be recorded in each bell book. The following entries were made in the respective books before and following the collision:

Deck Bell Book (Ex. C–4)
0137 - Stop.
0139 - Full Astern.
0140 - Stop.
0155 - Half Astern.
0159 - Stop.

Engine Bell Book (Ex. C–6)
0138 - Stop.
0140 - Full Astern.
0155 - Half Astern.
0157 - Stop.
0158 - Half Astern.
0159 - Stop.

Naturally, whether the engines stopped at 0140 or continued full astern until 0155 will have a bearing upon how far she traveled after the accident. The claimant's expert based his calculations upon the orders as recorded in the Engine Bell Book. If the Deck Bell Book is correct, the collision situs as proposed by the expert is shifted toward the east, closer to the collision locale suggested by the plaintiffs.

We find the evidence on the accuracy of the bell books inconclusive. On the one hand, Captain Orton (Ex. C–31, p. 41–42) and the second officer (N.T. 118) testified that the 0140 stop order was executed. On the other hand, claimant's expert stated that in his experience the Engine Bell Book was more reliable in an emergency situation because the engine room would be free from excitement caused by the collision. The expert also testified that if the stop order had been executed, the Santos would have had too much speed to anchor safely at 0140. Also, the watch officer in the engine room at time of the accident said that all the orders recorded in the Engine Bell Book were executed. (Ex. C–29, p. 18–20). On the basis of this testimony, we are not convinced that the claimant's expert was correct in assuming the accuracy of the Engine Bell Book. Other evidence persuades us, however, that the accident was situated east of the spot proposed by the claimant.

We decline to accept the situs Mr. Suarez proposed and we conclude that the accident occurred either directly in the track to the Brandywine Range or just to the east of it. (Ex. C–24, point marked collision position stop; Ex. P–9, point marked X collision). We base this conclusion upon four factors. First, we credit Captain Orton's estimate of where he was picked up by the Santos in the Pilot Area. The Pilot's vast experience and thorough knowledge of the Bay area lends credence to his pinpointing of the pick-up point. Second, we accept Mr. Orton's testimony that his course placed the Santos on an attitude such that Buoy No. 9 was on her port and Buoy No. 10 was on her starboard. (Ex. C–31, p. 43). This would place the Santos in the middle of or close to the track to the Range. Third, accepting Captain Orton's testimony of the pick-up point and heading of the ship, Anthony Suarez' reconstruction of the ship's path leads to the area which we have concluded is the collision situs. Fourth, plaintiffs' theory placing the collision west of the entrance presupposes that the Harbor Star and tow drifted three miles to the southwest in the 20–25 minutes preceding the accident. (Claimant's Proposed Finding of Fact 43). Even accepting a wind blowing at 15–20 knots from the northeast, it is highly unlikely that the tug and tow could cover such a substantial distance so quickly. In the absence of evidence as to how the tug and tow could drift so rapidly, we reject plaintiff's theory.

IV. Lights on the Tow.

The claimant contends that there are only two possible explanations for the Santos' failure to see the barge lights sooner than 1000 feet from the barge: (1) the lights were not sufficiently bright, or (2) a dark sector existed between the stern light and side lights of the tow. The testimony, however, does not support either contention.

First, with regard to the intensity of the lights, Captain Maynard, master of the tug Judy Moran, passed the Harbor Star at 0230 and 2230 on September 12th. He testified that on both occasions the stern light (white) and side running lights (port: red; starboard: green) were burning brightly. (Ex. C–26, p. 6, 10–14). His testimony is corroborated by Captain MacDonald. (N.T. 186, 221) and Tom Balcom (N.T. 361). Further there is uncontradicted testimony from Captains Orton and Maynard that the stern light was burning following the accident. (Ex. C–31, p. 49–50, Ex. C–26, p. 22).

Second, Captain MacDonald's testimony reveals that he had an ample opportunity to view the tug and tow from all angles. He stated that he observed no blind spots. (N.T. 187, 314). This was corroborated by the mate, Tom Balcom. (N.T. 333, 362). Furthermore, the side lights on the tow were 10 point lights and the stern light was 12 points. (N.T. 187). Since there is no evidence to the contrary, we conclude that the lights were sufficiently intense, and that there were no blind spots which contributed to the accident. Cf. *Sun Oil Co. v. S.S. Georgel*, 245 F.Supp. 537, 546 (S.D.N.Y. 1965), aff'd, 369 F.2d 406 (2d Cir. 1966) (per curiam) ("Affirmative testimony that lights were displayed is given greater weight than negative testimony that they were not.")

There is one last possible explanation for the Santos not viewing the barge sooner. As a result of viewing only one pip on the radar and observing the tug for over an hour without spotting a tow, Captains Orton and Cano and the crew of the Santos discounted the possibility of a tow. The probability of this explanation is supported by Captain Cano's testimony that he simply thought the tug master had forgotten to turn off its lights or that the lights were operating in anticipation of picking up a tow. (Ex. C–25, p. 123–24). Having discounted the existence of a tow, the crew of the Santos relaxed its vigilant surveillance of the tug and thus neglected to identify the tow until it was too late to avoid the collision.

## CONCLUSIONS OF LAW

I. Fault of the Harbor Star.

A. The Harbor Star is at Fault for Failing to Maintain a Position Outside the Approaches to the Brandywine Range.

Although the claimant alleges a number of specific statutory faults on the part of the tug, the crux of the claimant's argument is that the personnel of the Harbor Star were negligent in their execution of the shortening-up operation. Captain MacDonald's selection of a place in which to shorten up manifests no negligence since the region to the east of the approach to the Brandywine Range was often employed reasonably by tugs to shorten up. Rather, Captain MacDonald was negligent in the manner in which the operation was accomplished. We reject plaintiffs' position that, as long as she was shortening up, the Harbor Star was free to drift all over the Delaware Bay with impunity. The tug master not only must select an appropriate place to shorten up, but he also must remain in that locale during the operation.

At trial, Captain MacDonald acknowledged that he had a duty not to do anything which would obstruct or hinder navigation. (N.T. 320). Allowing a tow to drift into or very near the track to a major maritime thoroughfare hinders navigation. He had access to the necessary controls at the aft steering station, but he failed to remain vigilant in monitoring his position in the bay. Notwithstanding the fact that the Pilot Station had not mentioned that any incoming traffic was expected, he should have remained vigilant in his attempts to keep the tug from drifting during the shortening-up process. Captain MacDonald was negligent in failing to maintain the position of the tug and tow outside the track to the Brandywine Range.

The Captain was also negligent in failing to call the extra man off watch to act as a lookout. As will be discussed later, a proper lookout was required in this case, and the

failure of the Captain to recognize this need amounted to negligence.

## B. Failure to Station a Lookout.

As the hawser was being pulled in, Captain MacDonald was supervising the three men on the stern from the aft control station which was situated about 40 feet from the wheelhouse. All the navigation equipment was located in the wheelhouse which Captain MacDonald visited twice during shortening up to check the radar. No one was stationed in the wheelhouse to observe the navigation gear and no one was assigned to act as lookout.

Tankore contends that the Harbor Star was at fault in two ways in stationing personnel for the shortening up operation: (1) failing to maintain a lookout astern, 33 U.S.C. § 221,[1] and (2) failing to station a man in the wheelhouse to watch the radar and compass. Tankore has offered these as separate contentions, but we elect to discuss them together due to our resolution of the contentions.

■ In support of its lookout claim, Tankore relies upon the authority of *Ellis Towing & Transp. Co. v. Socony Mobil Oil Co.*, 292 F.2d 91 (5th Cir. 1961), where the court stated:

There are, of course, circumstances under which a vessel must keep a lookout astern. These include movements of the vessel in that direction and, where appropriate, actions which are likely to imperil the safety or navigation of vessels known to be astern.

*Id.* at 95. In the same vein, another court has noted that "[a] tug which is drifting or maneuvering in such a way that there may be danger astern must keep a lookout astern." *Lehigh Valley R. R. Co. v. Tug Blackjack 21*, 208 F.Supp. 648, 653 (S.D.N.Y. 1962) (tug backing out from pier into channel without lookout astern held at fault).

Plaintiff counters any allegation of fault by directing our attention to the well-settled rule that an overtaken vessel has no duty to post a lookout astern so long as she has a visible stern light. *Ellis Towing & Transp. Co. v. Socony Mobil Oil Co., supra; Sun Oil v. M/V Wartenfels*, 250 F.Supp. 244 (E.D. Pa.1966); Griffin on Collision § 108, at 276 (1949).

With respect to the manned wheelhouse claim, Tankore states that the master of the tug lost track of the tug's position in the bay because of the attention required by his other duties and his lack of access to navigational aids. Claimant reasons that a man stationed in the wheelhouse with the specific duty of observing the compass and radar would have been able to discover the tug's change of position and could have informed the Captain of the excess drifting. Claimant concludes that a duty should be imposed upon the tug to place a man in the wheelhouse to observe the navigational gear.

While it would be convenient if such clearly defined duties could be drawn, such is not the case here. The Harbor Star was an overtaken vessel and as such was owed certain responsibilities by the overtaking vessel. At the least, the Santos had a duty to stay clear of the overtaken vessel. On the other hand, a tug engaged in shortening up is not navigating in the same manner as a typical overtaken vessel. When a tug is shortening up, it is not unusual for her to lose most, if not all, of her headway. (N.T. 347). This loss of forward motion creates a danger that the tug will become subject to the tides and winds and thus drift. The danger caused by excess drifting may become great if the crew is not paying close attention to the position of the tug and barge. Further, this danger significantly increases when the tug is navigating in unfamiliar waters at night. In other words, shortening up contains elements of both the overtaking and drifting situations

---

1. 33 U.S.C. § 221 provides in part:
 Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences . . . of any neglect to keep a proper lookout . . . .

and thus neither set of cases, by itself, can control the duties imposed on the tug in this context.[2]

■ The crux of the problem aboard the Harbor Star was that the Captain was charged with too many responsibilities which were essential to the prudent navigation of the tug in strange waters at night. It should be emphasized that Captain MacDonald had only been in the Delaware Bay once in the previous five years. While shortening up, Captain MacDonald's attention was divided among the following duties: (1) overseeing the three men on the stern (N.T. 251); (2) jogging the tug ahead to keep the hawser sufficiently taut (N.T. 217, 252, 348); (3) keeping track of the tug's position in the bay (N.T. 252); (4) keeping a lookout astern (N.T. 268).[3] The effective discharge of all these duties was necessary to the safe operation of the tug. If some of these responsibilities had been delegated to another member of the crew, the accident may have been avoided. The only duties which could have been delegated were the assignments of keeping track of the tug's position in the bay and of maintaining a lookout. The other responsibilities involving the actual operation of the vessel or the supervision of the men on the stern had to remain in the hands of the Captain.[4] We conclude that one lookout could accomplish both these chores. The major danger entailed in the shortening up operation is drifting which causes the additional risk of collision. In order to alleviate both these dangers, it is appropriate that the lookout be responsible both for visually keeping track of the tug's position in the bay and watching out for vessels approaching from the rear. The responsibility of maintaining the tug's position in the bay does not require the use of radar. In clear weather visual sightings of lights and landmarks should suffice to keep the tug in position.[5]

We are mindful of the rule which clearly states that "the lookout must have no other duty". Griffin on Collision § 109, at 277 (1949); see *Oil Transfer Corp. v. Diesel Tanker F. A. Verdon, Inc.,* 192 F.Supp. 245, 247 (S.D.N.Y.1960). In this context, where the duties of maintaining a watch for other vessels and visually keeping track of the tug's position are so interrelated and substantially overlap, the lookout obligation that we have framed does not violate the salutary policy underlying the sole duty role. This is not a case where a lookout "whose other duties are such that he cannot

---

**2.** As far as we are able to determine, this problem is one of first impression. Neither the research of able counsel nor our independent investigation has uncovered a case considering the manner in which crew members should be stationed aboard a tug while she is shortening up in unfamiliar waters at night.

**3.** Captain Maynard, an experienced tug master, stated the manner in which the Harbor Star shortened up was the standard practice in the industry. (Ex. C–26, p. 37–38). In concluding that this practice constituted poor seamanship, Captain Maynard stated:

Q. My question is do you consider that [referring to the lack of a radar watch and lookout and the failure to assign someone to stand by the radio telephone] to be proper seamanship and good navigation?

A. Do I consider it? No, I think it is an economic result of what makes this job stink today. You want to understand, I have been sailing for a long, long while. They eliminate men and give us twice as much work to do and half the time to do it. If you ask me, it's not good seamanship; it's just luck that we get away with it.

(Ex. C–26, p. 37). The truth of Captain Maynard's observation is supported by Captain MacDonald's own admission that he did not think he had drifted as far as he actually had. (N.T. 280, 319).

**4.** The discussion of the Captain's duties disposes of the tug's contention that, if a lookout was required, then the Captain fulfilled that obligation.

**5.** This disposes of any claim that the Harbor Star was improperly equipped for not having navigational aids at the aft steering station. Captain MacDonald possessed the necessary engine controls to keep the tug and barge far to the east of the entrance to the Brandywine Range. If he had paid proper attention to his drifting or, if he had assigned someone to watch the drift of the tug, the accident would not have occurred.

devote his undivided attention to possible obstructions or dangers." *Grace Line, Inc. v. United States Lines Co.,* 193 F.Supp. 664, 672 (S.D.N.Y.1961), aff'd, 302 F.2d 933 (2d Cir. 1962) (per curiam).

In sum, because of the dangers presented by shortening up in unfamiliar waters at night, the Captain should have called upon another member of the crew to assist him for the 20–25 minute period required to shorten the hawser. Specifically a member of the Harbor Star's crew should have been assigned to act as a lookout with the responsibility of keeping track of the tug's position in these unfamiliar waters and of watching for other vessels. If a man had been detailed to perform this task, the tug would not have drifted so far and the accident probably would have been avoided.

### C. Improper Manning.

■ Claimant Tankore alleges that the tug was undermanned in two ways. First, the claimant argues that the tug did not have sufficient men aboard for the anticipated operations on the voyage. Second, claimant argues that the tug was undermanned as a matter of law since this voyage was to exceed 600 miles and there was not sufficient personnel to man three watches as required by statute for voyages of more than 600 miles. 46 U.S.C. § 673.[6]

The crew of the tug for this voyage consisted of seven persons: Captain MacDonald, Tom Balcom, two seamen, two engineers and a cook. The claimant correctly posits that the master, mate, two seamen, and one engineer were all necessary to achieve the shortening-up procedure. This occupied everyone who was on watch at the time. The Tankore argues that no one was left to keep a lookout. Claimant contends, therefore, that the ship was undermanned because it must have been anticipated prior to the voyage that the hawser would have

---

**6.** The claimants rely upon:
46 U.S.C. § 673 which provides in pertinent part:

In all merchant vessels of the United States of more than one hundred tons gross, excepting those navigating rivers, harbors, lakes (other than Great Lakes), bays, sounds, bayous, and canals, exclusively, the licensed officers and sailors, coal passers, firemen, oilers, and water tenders shall, while at sea, be divided into at least three watches, which shall be kept on duty successively for the performance of ordinary work incident to the sailing and management of the vessel: . .. Provided, That in all tugs and barges subject to this section when engaged on a voyage of less than six hundred miles, the licensed officers and members of crews other than coal passers, firemen, lilers, and water tenders may, while at sea, be divided into not less than two watches, but nothing in this proviso shall be construed as repealing any part of section 222 of this title . . ..

The question here is whether the "voyage" exceeded 600 miles. The parties have stipulated that the distance between Boston and Philadelphia, along the route travelled by the Harbor Star, is 472 miles one way and 944 miles round trip. The issue thus becomes whether the "voyage" was to Philadelphia or whether it was to be the round trip.

"Voyage" as used in 46 U.S.C. § 673 is defined in 46 C.F.R. 3157: 20–5(b) as follows:

A voyage of less than 600 miles is construed as meaning the entire distance traversed in proceeding from the initial port of departure to the final port of destination, stops at intermediate ports while on route not being considered as breaking the continuity of the voyage.

Tankore contends that Philadelphia was an intermediate port since the tug's fee was to be computed upon an hourly rate for the round trip. The claimant relies upon the testimony of John Upton, former general manager of Boston Fuel, that the voyage was to be round trip. (Ex. P–31, p. 7).

Plaintiffs' position is that since the tug had traveled only 385 miles at the time of the accident, it did not come within the ambit of the statute. This contention seems doubtful since it is obvious that the statute refers to the "voyage" contemplated, rather than how far it actually progressed. The "voyage" contemplated in this case presents serious problems since no final decision had been made about what the tug and crew were to do once they had delivered the barge in Philadelphia. The plaintiffs also contend that Philadelphia should be found to be the "final port of destination" since that was where the tow was to be dropped and the crew was either to lay over there or pick up replacements while a return tow was being arranged. Due to our disposition of the causation element, we need not resolve these novel arguments.

to be taken in before proceeding up the Delaware River to Philadelphia.

■ The claimant's argument, however, fails to take into account the presence of an extra engineer who was not on watch at the time of the shortening up. Captain MacDonald could have called upon this off-watch engineer to serve as a lookout for the 20–25 minutes required to shorten up. (N.T. 227–28, 304). In fact, on other occasions, Captain MacDonald had called upon personnel to keep a lookout who were off watch. (N.T. 304, 315–16, 410). Thus, since there was an individual available as a lookout, the tug was not undermanned for the anticipated maneuver of shortening up.

Claimant's second ground for fault as a result of undermanning suffers from the same causation problems. Even if we assume that there was a statutory violation, this could not have caused the accident since the Captain still would have had to call a man off watch to keep a lookout. Thus, once again, the fault did not lie with an insufficient number of watches aboard the tug, but rather with the tug master's failure to call one person off watch to help out while the hawser was being taken in.

### D. Proceeding into Inland Waters with a Hawser Exceeding 450 Feet in Length.

■ Tugs are limited in the length of towlines they may utilize in certain places. The pertinent provision, 33 C.F.R. § 84.10, of the Pilot Rules provides as follows:

7. The plaintiffs contend that 33 C.F.R. § 84.-10(b)(4) provides that the hawser length limitations do not apply at until 20 miles north of the point at which the accident occurred. We note, however, that the cited regulation simply removes the discretionary element of the statute as follows:

 (b) In any event the hawsers between vessels must be shortened to the prescribed length of not more than 450 feet (75 fathoms) when the tows with inland or seagoing barges are operating on the following named localities:

 (4) Delaware Bay north of Elbow of Cross Ledge Light. 33 C.F.R. § 84.10(b)(4).

The length of hawsers between vessels shall be limited to no more than 450 feet (75 fathoms). This length shall be the distance measured from the astern of one vessel to the bow of the following vessel. The distance between two vessels should in all cases be as much shorter as the weather or sea will permit. Provided, that *where in the opinion of the master of the towing vessel, it is dangerous or inadvisable, whether on account of the state of the weather or sea or otherwise, to limit the hawser lengths, the 450 feet limitation need not apply.* (emphasis added)

The Harbor Star proceeded into the Delaware Bay with the barge on a 1200 foot towline. The question becomes whether the Captain properly exercised his discretion.[7]

While there was a dispute with regard to the weather conditions, we accept Captain MacDonald's testimony that there was a slight easterly swell which caused him to shorten up inside. (N.T. 218) Thus, he did not abuse his discretion. Further, it is customary for tugs to go up in this area to shorten up. At any rate, even if the statutory duty was breached, we can find no causation between a violation of this statute and the collision since there was no more than 300 feet of hawser out at the time of the accident.[8]

### E. Position, Course and Speed in an Overtaking Situation.

Both parties concede that the approach of the Santos placed the ships in an overtaking

8. The claimant urges that we accept as controlling the cases of *American Hawaiian S.S. Co. v. Steamtug Baldrock,* 1934 AMC 1282 (E.D.N.Y. 1934) (tug with three barges in tow on hawsers of approximately 1100 feet), and Hygrade No. 12, 33 F.Supp. 149 (E.D.N.Y.1940), aff'd, 130 F.2d 256 (2d Cir. 1942) (per curiam) tug with three barges in tow; 1000 feet of hawser between tug and first tow and 600 feet between the remaining tows). However, we need only note that in both these cases as contrasted with the instant case the hawser out *at the time of the accident* exceeded the statutory limits.

situation as defined by the statute.[9] Tankore argues that the drift of the Harbor Star violated its duty as the overtaken vessel to hold her course and speed.[10]

■ It is well settled that, under certain circumstances, the overtaken vessel, in this case the tug and tow, has a duty to maintain her course and speed. This duty, however, does not arise until the overtaking vessel has made her presence known by signalling her intention to pass. See *Industry*, 29 F.2d 29, 30 (2d Cir. 1928), cert. denied sub nom. *N.Y. & N.J. S.S. Co. v. Schomburg*, 279 U.S. 837, 49 S.Ct. 251, 73 L.Ed. 985 (1929); *Tug Ocean Queen, Inc. v. Tanker Four Lakes*, 398 F.Supp. 1062, 1069 (S.D.N.Y.1974); *In re Landis Petition*, 194 F.Supp. 353, 361 (S.D.N.Y.1960). The Santos never signalled her intention to pass in any manner, and thus the statutory duty never arose for the tug.

Furthermore, the cases which have found a violation of the overtaken vessel's duty involve a violent or sudden change of course by the overtaken vessel. See, e.g., *Larsen v. Portland California S.S. Co.*, 66 F.2d 326 (9th Cir. 1933). In this case, there is not and there could not be an allegation that the tug suddenly altered its course or veered in front of the bow of the overtaking vessel. The tug had been drifting slowly toward the southwest for approximately 20 minutes. In short, there was simply no change in course or speed as contemplated by the statute. We conclude that the tug did not violate any duties imposed upon it by the overtaking rules.

F. Other Allegations of Statutory Fault.

■ The aft control station of the tug was not equipped with a radio transmitter. A speaker, placed in the galley, was close enough to that station so that someone stationed at the aft controls could hear any radio telephone transmissions. The claimant argues that the absence of a radio transmitter violated 33 U.S.C. § 1203 [11] and also constituted a failure to man a proper radio watch in violation of 33 U.S.C. § 1204.[12] Even if we accept the claimant's allegations of statutory violations, we must consider the effect of the rule of the *Pennsylvania*, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1873). This rule provides that a party breaching a statutory duty has the burden to prove that the breach could not have caused or contributed to the collision. *In re Tug Management Corp.*, 330 F.Supp. 486, 498 (E.D.Pa.1971). It is clear that any violations of 33 U.S.C. §§ 1203–1204 could not have caused or contributed to the collision since the Santos never sent any transmissions to the tug prior to the accident.

9. 33 U.S.C. § 209 provides in part:
 Every vessel coming up with another vessel from any direction more than two points abaft her beam, that is, in such a position with reference to the vessel which she is overtaking that at night she would be unable to see either of that vessel's side lights, shall be deemed to be an overtaking vessel; and no subsequent alteration of the bearing between the two vessels shall make the overtaking vessel a crossing vessel within the meaning of these rules, or relieve her of the duty of keeping clear of the overtaken vessel until she is finally past and clear.

10. 33 U.S.C. § 206 provides in part:
 Where, by any of these rules, one of the two vessels is to keep out of the way, the other shall keep her course and speed.

11. 33 U.S.C. § 1203 provides:
 (a) Except as provided in section 1206 of this title—

 (3) every towing vessel of twenty-six feet or over in length while navigating;
 shall have a radiotelephone capable of operation from its navigational bridge . . . .

12. 33 U.S.C. § 1204 provides:
 The radiotelephone required by this chapter is for the exclusive use of the master or person in charge of the vessel, or the person designated by the master or person in charge to pilot or direct the movement of the vessel, who shall maintain a listening watch on the designated frequency.
 Claimant essentially argues that the maintenance of a proper listening watch, as contemplated by § 1203 and in the context of the entire statutory scheme, requires not only an ability to receive messages, but also the ability to transmit immediately.

Further, the crew of the Harbor Star did not spot the Santos until it was too late to avoid the collision and thus the lack of a transmitter at the aft steering station could not have contributed to the collision.

■ In the same vein, the claimant alleges that the Harbor Star was at fault for not sending a timely danger signal. This claim also suffers from a lack of causation. The crew of the Harbor Star did not see the Santos until she was right upon the barge, and a danger signal at that time would not have enabled either vessel to avoid the collision.

## II. Fault of the Santos

### A. The Santos is at Fault for Failing to Recognize That the Tug Had a Vessel in Tow.

■ Plaintiffs allege that the Santos violated a number of specific statutes and rules. While we intend to address each argument separately, these allegations are merely components of the plaintiffs' general contention that the Santos was negligent in failing to recognize that the Harbor Star had a vessel in tow, and in failing to determine the position of that tow. We conclude that this general position has merit and find that the Santos was negligent in failing to recognize and to ascertain the position of the barge.

■ Once the Santos viewed the tug with its three towing lights signifying a tow astern, prudent seamanship compelled the crew of that ship to determine the location of the tow, or at the very least to give her an extremely wide berth.[13] *Lizzie M. Walker,* 3 F.2d 921, 922 (4th Cir. 1925); *Moran Scow Corp. v. S.S. Boston,* 342 F.Supp. 216, 233–34 (S.D.N.Y.1972); *Petition of Harbor Towing Corp.,* 310 F.Supp.

775, 782 (D.Md.1970), aff'd, 438 F.2d 535 (4th Cir. 1971) (per curiam); *Triangle Cement Corp. v. Towboat Cincinnati,* 280 F.Supp. 73, 75 (S.D.N.Y.1967), aff'd, 393 F.2d 936 (2d Cir. 1968) (per curiam). The crew of the Santos had no right to assume that the tow was being hauled close astern (Ex. C–31, p. 27, 51, 65) or that there was no tow at all. (Ex. C–25, p. 123–24). *Petition of Harbor Towing Corp.,* supra, 310 F.Supp. at 782. Neither was the Captain of the Santos justified in assuming that the pilot would telephone the tug to inquire about the presence of a tow. (Ex. C–25, p. 124, 168). Having spotted the towing lights and considering the proximity of the tug to the anticipated course of the Santos, ordinary prudence imposed an obligation upon the Santos to determine the situs of the tow. This responsibility could have been fulfilled by telephoning the bridge of the tug, maintaining a radar watch, or at the very least, posting a lookout on the bow. The Santos chose to follow none of these courses.

To compound her manifest lack of caution, the Santos, unaware of what lay astern of the tug, chose to pass only 500 feet astern of the tug when it had miles of room in which to circumvent the Harbor Star. We conclude that the Santos was neither operated nor navigated in a prudent manner, and that this absence of prudence caused the accident. We now turn to plaintiffs' specific allegations of statutory fault.

### B. Failure to Carry a Lookout Forward.

At the time of the accident, the lookout on the Santos was stationed on the wing of the bridge rather than on the bow. The bow is approximately 264 feet forward from the bridge. Plaintiffs urge that the failure of the Santos to carry a lookout forward violated 33 U.S.C. § 221, requiring

---

**13.** The claimant attempts to distinguish the first three cases cited on the ground that in these cases the tug always kept the tow in position. This contention, however, fails to note the focus of those cases upon the operation of the approaching vessel, rather than the navigation of the tug and tow. Regardless of the conduct of the tug, the Santos had a duty to locate the barge, a duty it never fulfilled.

a "proper lookout", and that such violation contributed to the accident.

 "While there is no statutorily prescribed location for a lookout, it has been generally held that he should be on · the bow of the vessel." *In re Tug Management Corp.*, 330 F.Supp. 486, 499 (E.D.Pa. 1971); see *Sun Oil Co. v. S.S. Georgel*, 245 F.Supp. 537, 545 (S.D.N.Y.), aff'd, 369 F.2d 406 (2d Cir. 1966) (per curiam); Griffin on Collision § 107, at 271 (1949). It is incumbent upon a ship to post a lookout forward when it is proceeding where limited visibility exists. See, e.g., *Norscot Shipping Co. v. S.S. President Harrison*, 308 F.Supp. 1100, 1106 (E.D.Pa.1970). We conclude that the duty posting of a "proper lookout", when proceeding in the face of an unascertained tow, requires that the lookout be stationed on the bow.

Failure to post a proper lookout is a statutory fault which brings the Pennsylvania rule into play. Mr. Suarez testified that for the Santos to have avoided the barge the crew would have been required to see the green light when it was still "[s]omewhere on the order of 1500 feet, 2½ lengths of the vessel," from the barge. (N.T. 582). Later, Mr. Suarez qualified his testimony, stating that it might have required only 2 ship lengths to have avoided the collision. (N.T. 616). If we accept the estimate of 2 lengths, then 1200 feet of clearance between the bow of the tanker and the tow was necessary for the accident to have been avoided. The testimony from those aboard the Santos at the time of the accident is unanimous that the green side-light on the barge was not spotted until they were 1000 feet from the barge. Thus, since it is 264 feet from the bow to the bridge, the bow at

that moment was only 736 feet from the barge. Even if a lookout had been positioned on the bow, there still would have been only 1000 feet clearance between the Santos and the tow, at least 200 feet short of the distance necessary for the tanker to have passed safely astern of the tow. Thus, although the claimants violated the statutory lookout rule, this violation could not have contributed to the collision.

C. Santos' Use of Her Radar.

After the pilot boarded the Santos and checked the radar initially, no constant radar watch was maintained aboard the Santos. Prior to the pilot's viewing the radar, the radar had been checked at least once by Captain Cano.[14] Both Upton and Cano saw only one target on the screen,[15] and apparently they assumed that target represented the tug or a tug and a tow being hauled close astern.

 Plaintiffs contend that the Santos was at fault for failing to maintain a constant radar watch. Noting that visibility was virtually unlimited, the claimant responds that no duty to maintain a radar watch exists where the target was under constant visual observation. This may be true as a general proposition, but here we are confronted with a tug showing towing lights and a tanker unable to locate the tow. "The law places on the approaching vessel an affirmative duty to use radar when the situation ahead is unclear or confusing. . . . [T]he rule has been applied equally to clear weather situations, especially at night, where, as here there is uncertainty as to the movements of an approaching vessel." *Moran Scow Corp. v. S.S. Boston*, 342 F.Supp. 216, 239 (S.D.N.Y.

14. When Orton first checked the radar, it was on the four-mile scale. A single target showed "[r]ight on the four-mile ring." (Ex. C–31, p. 61). The scale was not expanded to the eight-mile ring at that time. The plaintiff contends that this failure to expand the ring constituted fault on the part of the claimant. Due to our finding that the circumstances of this case required a constant radar watch, we need not address this specific contention.

15. It is not exactly clear why only one target showed on the radar screen. One possible explanation is that the size of the barge prevented the tug from appearing as a separate and distinct target. (Ex. C–31, p. 20). No testimony was presented that this blocking out effect would have continued as the Santos approached the tug and barge.

1972); see *Dredge Cartagena v. S.S. Syra,* 1968 A.M.C. 2235, 2240 (D.Md.1968) (failure of vessel to use radar at night to ascertain position of dredge pipeline). We believe that when a vessel is faced with uncertainty about the situs of a vessel ahead, whether it be an approaching, crossing or overtaking situation, the uncertain vessel has a duty to use its radar to ascertain what is ahead. The crew of the Santos chose not to man a radar watch notwithstanding the fact that they had viewed the tug's towing lights and they had not been able to locate the tow. We find that this failure constituted fault.

Having found that the circumstances warranted a radar watch, we must now determine whether the claimant's failure to monitor the radar contributed to the accident. *Afran Transport Co. v. Bergechief,* 274 F.2d 469, 475 (2d. Cir. 1960); *Moran Scow Corp. v. S.S. Boston,* supra, 342 F.Supp. at 239–40. Although the radar showed only one target, no testimony was presented to show conclusively that this necessarily would have remained the case had constant radar surveillance been maintained. Thus, we conclude that the failure of the Santos to maintain a radar watch when the contents of waters ahead were uncertain amounted to fault and it contributed to the accident.

■ Plaintiff also argues that the Santos was at fault for failing to plot the course of the tug and tow. The duty to plot has been imposed where, because of the risk of collision raised by ships' inability in poor visibility to ascertain the "closest point of approach, course and speed" of each other, plotting was the most efficient way to determine these facts. *Orient Steam Navigation Co. v. United States,* 231 F.Supp. 469, 474 (S.D.Cal.1964); see *Getty Oil v. S.S. Ponce DeLeon,* 409 F.Supp. 909, 918 (S.D.N.Y.1976). This duty is not applicable in this case since the peril flowed not from the failure to establish the course of the tug and barge, but rather from the failure to ascertain the existence and position of the tow. Plotting would not have aided this

necessary determination. Moreover, the Santos had the Harbor Star under visual observation for at least an hour prior to the collision, so that the course and bearing of the tug was not a mystery to the tanker. Therefore, since the danger in this overtaking situation arose solely from the failure to inquire into the existence, rather than the course, of the tow, we find no duty to plot on these facts.

### D. Other Allegations of Statutory Fault on Santos' Part.

■ After the tow was sighted, the pilot attempted to blow the ship's whistles to warn the tug of the impending collision. The whistles failed to work and thus, the Santos breached 33 U.S.C. § 191. However, since this attempt to blow the whistles was made within 1000 feet of the barge and the tow could not have been moved quickly, the violation could not have contributed to the accident. Cf. *Tiger Shipping Co. v. Tug Carville,* 381 F.Supp. 1340 (E.D.Va.1974). Similarly even if we assume that the Santos breached 33 U.S.C. § 201 by neglecting to carefully watch the compass bearing of the vessel in order to avoid a collision, this neglect could not have caused the accident since the Santos collided with the barge rather than the tug. The accident resulted from the failure of the Santos to find the tow and then give it a wide berth when passing.

The plaintiffs also urge we find the Santos at fault under 33 U.S.C. § 212. We decline to do so since the plaintiffs have not alleged any particular fault on the part of the Santos that would require application of this "special circumstances" rule.

### III. Limitation of Liability.

■ Both BFT and Boston Fuel seek to limit their liability pursuant to 46 U.S.C. § 181 et seq. The contentions posed by these requests reveal the following issues: (1) Does BFT or Boston Fuel come within the terms of the limitations statute, (2) if they do, are they prohibited from limiting

their liability because they were "in privity with" or had "knowledge of" a fault which contributed to or caused the collision, and (3) if limitation is allowed, what is the size of the limitation fund? Pursuant to an oral agreement, Boston Fuel supplied a crew, insurance and business for the owner of the tug, BFT. All income generated by the tug is credited directly to BFT and all expenses directly attributable to the tug are charged directly to BFT.[16] At the end of each calendar year, BFT pays Boston Fuel an operating fee based upon the income generated by the Harbor Star.

A. BFT and Boston Fuel are Owners or Charterers Within the Meaning of the Limitation Statutes.

It is clear that BFT is the titled owner of the tug and as such lies within the ambit of the limitation statutes. The claimant, however, vigorously contests Boston Fuel's contention that it is an owner or charterer within 46 U.S.C. § 183[17] and 46 U.S.C. § 186[18] and that thus it should be entitled to limit its liability to the value of the vessel and then pending freight.

■ A charter agreement justifying the plaintiffs' request need not be written, so long as it is express and embodies certain terms which establish the relationship of the parties to the vessel. *Jones & Laughlin Steel Corp. v. Vang*, 73 F.2d 88, 90 (3d Cir. 1934), cert. dismissed, 294 U.S. 735, 55 S.Ct. 406, 79 L.Ed. 1263 (1935). Also, the agreement need not identify itself in the terms "charter" or "charter party." *In re Peti-*

*tion of United States*, 259 F.2d 608, 609 (3d Cir. 1958). While we are not certain that the terms embodied in the oral agreement between Boston Fuel and BFT would normally constitute a "charter party", the case of *In re Petition of United States* (the *Mathiasen* case), supra, compels us to conclude that Boston Fuel may limit its liability in this case.

The *Mathiasen* case involved an agreement very similar to the one here. In that case, Mathiasen's Tanker Industries, Inc. contracted with an agency of the United States Navy to manage and operate tankers for the Navy. The specifics of the agreement provided that the operator would supply the crew, equipment, fuel, and other items for the vessels and receive compensation for its services on a cost-plus basis.[19] No labor agreements were to be entered into by Mathiasen that related solely to the Government-owned ships. The District Court concluded that, although the agreement made no mention of the word charter, Mathiasen had "exclusive possession and management" of the tanker and thus must be found to be a "charterer" within the meaning of § 186. 155 F.Supp. 714, 717 (D.Del.1957).

The Court of Appeals for the Third Circuit expanded upon the District Court's conclusion, stating:

As we see it, Mathiasen's role under the contract partakes of the nature of both charterer and owner pro hac vice. Either status justifies its petition for limitation.

---

16. Expenses which would be considered directly attributable to the tug may be categorized as food, fuel, supplies and wages. Boston Fuel's office expenses and shoreside employees were supported by the fees generated by operating the tug Harbor Star and other towing vessels.

17. 46 U.S.C. § 183(a) provides:

The liability of the owner of any vessel . . . for any loss, damage, or injury by collision, or for any act, matter or thing, loss, damage, forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners shall not . . . exceed the amount or value of the interest of such owner or such vessel and her freight then pending.

18. 46 U.S.C. § 186 extends the limitation protection even further stating:

The charterer of any vessel, in case he shall man, victual, and navigate such vessel at his own expense, or by his own procurement, shall be deemed the owner of such vessel within the meaning of the provisions of this chapter relating to the limitation of the liability of the owners of vessels.

19. The Third Circuit found that this method of payment to the operator did not contravene § 186's mandate that the charterer "shall man, victual, and navigate such vessel at his own expense, or by his own procurement. . . ." 259 F.2d at 609–10. We find that the expenses charged to BFT by Boston Fuel constitute a closely analogous arrangement whereby BFT is simply reimbursed directly for expenses directly attributable to the operation of the Harbor Star.

We do not think that the clause providing for the vessel to be operated "in such service as the Government may direct" or the reference to government owned tankers as being "in the custody of the contractor" destroys the total effect of the contract making Mathiasen a charterer of the Mission. It seems to us that in every substantial sense needed to support its right to file the petition the contractor became just that. In *Thorp v. Hammond,* 1870, 12 Wall. 408, 20 L.Ed. 419, there was no agreement which named Hammond as the charterer but the vessel was commanded, sailed and exclusively managed by him "whereby" as the Supreme Court said, at page 416, "he had in effect become the charterer of the vessel." The Court on the following page specifically stated "*Hammond,* therefore, is to be regarded as the owner, *because the charterer,* and as such responsible for the tortious acts of the vessel." (Emphasis supplied) . . .. This same sort of broad construction was taken of the word owner in *Flink v. Paladini,* 1929, 279 U.S. 59, at page 63, 49 S.Ct. 255, 73 L.Ed. 613, where the Court said:

> "We are of the opinion that the words of the [limitation] acts must be taken in a broad and popular sense in order not to defeat the manifest intent * * to interpret an untechnical word in the liberal way in which we believe it to have been used—as has been done in other cases."

We are satisfied that whether Mathiasen's status be accepted as charterer or owner pro hac vice " * * * [its contractual] relationship [to the ship] might reasonably furnish ground upon which a claim of liability for damage could be asserted." *The Milwaukee,* D.C.E.D.Wis. 1931, 48 F.2d 842. In that case, speaking of the *Flink* opinion, supra, the court said: "That case seems to indicate that whether or not one is to be deemed an 'owner' depends largely upon the possibility that he may be subjected to a liability which ordinarily is assertable against one having, or claiming to have, proprietorship or dominion over the subject of the proceeding. It negatives the thought that 'owner' of, or to 'own' a vessel means the situs of full title, interest, or dominion, and that nothing else is within the definition of the right or the range of the statute." See also *Petition of Colonial Trust Co.,* D.C.D.Conn.1954, 124 F.Supp. 73.

. . . A prime purpose of the limitation acts has been to promote the employment of vessels in commerce and the encouragement of persons engaged in the business of navigation. *American Car & Foundry Co. v. Brassert,* 1933, 289 U.S. 261, 263, 53 S.Ct. 618, 77 L.Ed. 1162; *Moore v. American Transportation Co.,* 1860, 24 How. 1, 39, 16 L.Ed. 674. Mathiasen in this collision, as to third parties, had virtually the responsibility of the record owner. Under the theory and purpose of the statute Mathiasen should be afforded the same kind of protection against the possibility of the crushing loss which might arise as is given said owner. 73 F.2d at 610–11 (citations omitted).

Claimant argues that *Mathiasen* should not guide our decision because the operator in that case had the risk of full liability. We cannot perceive how Mathiasen's exposure to liability differs from that of the operators of the tug Harbor Star. Both Mathiasen and Boston Fuel are "engaged in the business of navigation" as operators of vessels owned by other concerns. It is because of their status as operators that they are potentially liable for the negligence of the vessels, and it is because of their status as operators that they fall within the scope of the limitations statutes.[20]

20. Having found that Boston Fuel falls within the ambit of the *Mathiasen* case, we need not address claimant's contentions that Boston Fuel was only a bailee of the tug or that it simply functioned as an agent for BFT.

Some significance might be given to the close corporate relationship between Boston Fuel and BFT as a distinguishing factor between this case and the *Mathiasen* case where the parties were the federal government and an independent contractor. This position would fail to respect the *Mathiasen* court's focus upon the terms of the operating agreement and the degree of control exercised over the vessel by the operator. These factors are controlling rather than an inquiry into the corporate relationship between the owner and operator.

B. Were BFT and Boston Fuel in Privity With or Have Knowledge of any Fault so as to Defeat Their Rights to Limit Their Liability?

■ Even though the plaintiffs have been found to be charterers or owners, they are entitled to limit their liability only if the faults of the tug which caused or contributed to the collision were committed without their privity or knowledge. The analysis of this issue involves a two-step process. First, claimant must prove the substantive fault and causation, and then, if they are to secure limitation, the plaintiffs must show an absence of privity with or knowledge of that fault. *Farrell Lines, Inc. v. Jones,* 530 F.2d 7, 10 (5th Cir. 1976). We have found fault on the part of the tug in failing to maintain a proper lookout and in failing to exercise sufficient care in executing the shortening-up maneuver, i. e., not maintaining her position outside the track to the Brandywine Range. With respect to these faults, the burden rests upon the plaintiffs to establish lack of privity or knowledge. E.g., *Coryell v. Phipps,* 317 U.S. 406, 409, 63 S.Ct. 291, 87 L.Ed. 363 (1943). Where, as here, the shipowner or charterer is a corporation, the privity or knowledge necessary to defeat limitation must be that of a managing officer of the corporation. *Petition of Long,* 439 F.2d 109, 114 (2d Cir. 1971); G. Gilmore & C. Black, Jr., The Law of Admiralty, § 10–24 (2d Ed. 1975).

The policy of the limitation act recognizes that

because of the extraordinary hazards of seaborne commerce and because the owner can exercise only nominal control over his 'servants' once the ship has broken ground for the voyage, the owner should be entitled to exoneration from liability, or at least to a limitation of liability, for whatever happens after the ship has passed beyond his effective control. Contrariwise, he should be held to liability for all loss resulting from his failure to exercise effective control when he had the chance.

*Id.* at 877. It is apparent that the actual drifting of the tug and tow to the southwest constituted an operational fault beyond the control of the owners and solely attributable to the captain's lack of attention. However, the failure of the tug to properly maintain a lookout is not as easy to resolve. Essentially, the position of Boston Fuel's managerial personnel, Vincent Tibbetts and John Upton, was that the execution of the shortening-up operation, and manning of the ship while that maneuver was being executed, was left to Captain MacDonald's discretion. Claimant cites us to the case of *Tug Ocean Queen, Inc. v. Tanker Four Lakes,* 398 F.Supp. 1062 (S.D. N.Y.1974), which holds that the shipowner cannot delegate to the captain the extremely important duty of deciding when the ship should post a lookout. *Id.* at 1070. In that case, the court found the charterer of the tug Ocean Queen at fault for failing to post a lookout as it took a lefthand turn into the course of a vehicle to whom it had given its assent to pass. *Id.* at 1068. We disagree with that case. The policy of the Act seeks to protect owners from operational fault over which they have no control. Furthermore, the management employees entrusted this operation to a man who had worked for more than 25 years and had never had an accident. The management personnel in this case had no actual knowledge of or privity with the failure of the captain to post a lookout, and they had no non-delegable duty to decide in all situations to post a lookout. Therefore, since both Boston Fuel and BFT are charterers and owners and the faults that caused the accident occurred without their privity or knowledge, we hold that limitation is proper in this case.

C. Size of the Limitation Fund.

The limitation fund is set by the value of the tug and its pending freight at the time of the collision. The parties have stipulated that the value of the pending freight is $10,025.25. Thus, the only dispute involves the valuation of the tug.

Ten months prior to the accident, BFT purchased the Harbor Star for $52,500. The new owner cleaned and painted the bottom and removed the stern bearing at an estimated cost of $5,000. (N.T. 479). Also a radar set and a radio telephone were

installed to replace the equipment which originally had been on board on the tug. (N.T. 480–81). No value was ever placed on the replacement equipment.

The plaintiffs' theory is that contemporaneous value is best determined by what a willing buyer would pay a willing seller for the tug. As applied to the facts of this case, the plaintiffs contend that the tug should be valued at $52,500, the price paid by BFT in December, 1972, because any value increase attributable to BFT's installation of new apparatus was offset by the additional ten months age of the boat at the time of the accident.

The claimant has introduced an expert who concluded that the tug's contemporaneous worth was $74,194. The expert arrived at this figure by determining the price per horsepower of three tugs (one of which was the value of the Harbor Star in 1966, decreased by 7 years' depreciation). This price per horsepower for each tug was multiplied by the horsepower of the Harbor Star. The three prices for the Harbor Star were then averaged to arrive at the expert's final estimate.

■ We find the actual sales price, paid by BFT ten months prior to the accident, more persuasive than the expert's estimate.[21] The claimant has not produced any evidence tending to show that the December, 1972 sale of the tug was anything other than a fair transaction between a willing seller and a willing buyer. Indeed, the sale appears to be an arm's length deal between two independent business entities represented by knowledgeable businessmen. In the absence of any specific valuation of the new equipment, we conclude that the addition of the replacement radar and radio offset any decrease in the tug's value attributable to the passage of time. The Harbor Star should be valued, therefore, at $52,500, and the total limitation fund should be set at $62,525.25.

IV. Comparative Fault.

■ Having found both parties at fault, we now have occasion to apply the proportional fault rule set forth by the Supreme Court in *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975).[22] In abrogating the divided damages rule for maritime collision cases, the Court held:

> [W]hen two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of * * * fault.

Id. at 411, 95 S.Ct. at 1715.

The Court provided no guidelines to be considered in apportioning fault other than it must be "possible fairly to measure the comparative degree of fault." Id.

■ The navigators of the Santos must be classified as substantially more careless than those of the Harbor Star. The tug was definitely negligent in failing to maintain its position while shortening up, but its negligence is tempered, but not legitimized, by the fact that the pilot's station had not

---

**21.** We also note an internal inconsistency in the expert's testimony. In December, 1972, he had valued the tug in good condition at $65,000. Yet, at trial, he stated that it was worth $74,194 in September, 1973. No satisfactory explanation for this increase other than the 1973 estimate was more detailed, was ever presented. Indeed, the 1972 estimate was based upon the assumption that certain repairs would be made (N.T. 420, 423) and the evidence only shows one of these repairs was ever made. (N.T. 479). Further, there is no suggestion any improvements, other than the replacement of the radar and telephone, were made

that might account for the apparent appreciation between December, 1972 and September, 1973.

**22.** Since the accident and filing of suit predated the *Reliable Transfer* opinion, the retrospectivity of the Supreme Court's opinion must be considered. We find ourselves in agreement with the other courts which have decided to apply the rule of *Reliable Transfer* retrospectively. See, e.g., *In re S.S. Helena*, 529 F.2d 744, 754 (5th Cir. 1976); *Crown Zellerbach Corp. v. Willamette-Western Corp.*, 519 F.2d 1327, 1330 (9th Cir. 1975).

mentioned any incoming traffic to them. The Santos not only saw the Harbor Star more than one hour prior to the accident, but recognized the tug's three towing lights signaling a tow astern. Further, the pilot of the Santos was acquainted with the custom of tugs shortening-up in the area in which the lights were observed. Rather than telephoning the tug or maintaining a radar watch to ascertain the position of the tow, the Santos chose to barrel ahead only 500 feet astern of the tug in water where it could easily have afforded to grant the tug a wide berth. Because of the greater negligence of the Santos, we determine that it must bear 75% of the fault, while the Harbor Star's negligence caused it to be 25% at fault.

## V. Interest

The parties have stipulated to damages in this case which consist of $17,129.55 for repairs to the Santos and $247,500.00 paid by the owners of the Santos to the United States of America, the owner of the barge, in settlement of that claim. Since the tug was found to be responsible for 25% of the damages, it normally would be liable for $66,157.38. However, as noted above, we have determined that the tug was entitled to limit her liability to $62,525.25.

The claimant seeks prejudgment interest on its recovery computed from March 1, 1976, the date of its settlement payment to the barge owner. All parties agree that interest, if awarded, should be computed at 6% per annum. Thus, the sole issue is whether the claimant is entitled to prejudgment interest on its recovery.

The award of prejudgment interest is entrusted principally to the sound discretion of a court sitting in admiralty. See, e.g., *The Wright*, 109 F.2d 699 (2d Cir. 1940). The primary question is what factors should be taken into account in exercising this discretion and how much weight should be accorded each factor.

In the past, some courts have looked to the comparative fault of the parties as a consideration in the award of interest. Courts have reasoned that interest awards were an appropriate manner to mitigate the harsh consequences of the divided damages rule. *Iberian Tankers Co. v. Gates Constr. Co.*, 504 F.2d 747 (2d Cir. 1974); *Afran Transport Co. v. The Bergechief*, 285 F.2d 119 (2d Cir. 1960). However, absent unusual circumstances, this factor should no longer be considered in light of the proportionate fault announced by the Supreme Court in *Reliable Transfer*, supra. Under the proportionate fault rule, the degree of each parties' fault is taken into account in the initial determination of recovery. This formula obviously extinguishes the harsh effects of the divided damages rule. Further, to take proportionate fault into consideration in deciding on an award of prejudgment interest would penalize a party twice for the same mistake. Therefore, our determination that the Santos was more negligent will not be afforded any weight in our decision to award interest.[23]

Plaintiffs contend that no prejudgment interest should be permitted claimant because this case presented numerous factual and legal issues which were pursued in good faith. While some courts have adopted this as one factor to be weighed, *see Dow Chemical Co. v. Dixie Carriers, Inc.*, 463 F.2d 120, 123 (5th Cir. 1972), and we do not question the plaintiffs' good faith in litigating this case, it is not sufficient to overcome other considerations. The good faith of plaintiffs does not alter the fact that the parties were litigating responsibility for a liquidated fund, primarily composed of the settlement paid to the barge owner. "[W]here the only question is whether one party who has paid all the damages is entitled to reimbursement, an award of prejudgment interest is appropriate." *Ore Carriers of Liberia, Inc. v. Navi-*

---

**23.** Plaintiffs also suggest that no interest should be permitted because they fell within the protective cover of the limitation statutes. They argue that the settlement of the barge owner's claim conferred no benefit upon them because their liability was limited at trial. We reject this consideration. Indeed, it could be argued that that interest should be awarded against the limiting party in an attempt to alleviate the severe results fostered by the limitation statutes. Cf. *Afran Transport Co. v. The Bergechief*, supra.

*gen Co.*, 435 F.2d 549 (2d Cir. 1970). Further, the motives underlying plaintiffs' pursuit of this action should not be afforded great weight since the prejudgment interest principle is founded upon a compensatory, rather than punitive, base. *Ore Carriers of Liberia, Inc. v. Navigen Co.*, 305 F.Supp. 895 (S.D.N.Y.1969), aff'd, 435 F.2d 549 (2d Cir. 1970). Therefore, since this litigation involves essentially a liquidated sum and no extraordinary circumstances are present, we conclude that the claimant is entitled to interest at 6% per annum on its recovery to be computed from March 1, 1976 to the date of judgment.